[No. 26454-1-I.   Division One.   April 20, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. TODD J. CARLSON, *Appellant*.

*Jay Carey, Dennis Lee Burman,* and *Carey & Burman,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Scott D. Jackson, Deputy,* for respondent.

KENNEDY, J. — Appellant Todd Carlson appeals his conviction and sentence for second degree assault. Carlson contends that the juvenile court erred in finding that he committed second degree assault, assault with a deadly weapon, without making a finding of fact as to whether a BB gun is a deadly weapon. Carlson also contends that his sentencing should have been indefinitely stayed or the case dismissed for violation of his speedy disposition rights. We reverse the judgment as to second degree assault and remand for entry of judgment of guilty of fourth degree assault and for disposition consistent therewith.

I

On August 13, 1989, appellant Todd Carlson approached Cliff Ewell with what appeared to be a rifle. Carlson

pointed the gun at Ewell, and held the barrel inches from his face. Ewell grabbed the barrel of the gun and pushed it away. Ewell testified that Carlson stepped back and held the gun as if preparing to strike him with it. Carlson, however, did not strike Ewell, but turned and walked away.

Carlson was charged by information with committing second degree assault, assault with a deadly weapon, in violation of RCW 9A.36.021(1)(c).[1] At the fact-finding hearing on March 29, 1990, the gun was not placed into evidence. Carlson testified that the gun was an inoperative, unloaded, sawed-off BB gun. Carlson also testified that the safety switch was on and that the gun was incapable of firing in any event. Carlson did not tell Ewell that it was a BB gun nor did he tell Ewell that the gun was inoperative. Carlson testified that he pointed the BB gun at Ewell to intimidate and frighten him. A witness to the event, Kevin Speer, when asked what kind of gun Carlson pointed at Ewell, stated "I have no idea. It wasn't like a BB gun, but bigger than a BB gun." Ewell testified that "it was a hand gun. It was long — it was a rifle."

The trial court found Carlson guilty of assault in the second degree. In its oral findings, the court stated:

> the Court finds that the defendant came down the street with what is described by the victim as a rifle. Then as he — I think candidly indicates, he wasn't afraid of Todd, but he was kind of scared having that rifle pointed between his eyes — whether it be a rifle or not or whether it be a BB gun. As far as he was concerned, it was a rifle and it was a deadly weapon. And as he indicated, he was startled. This is confirmed by Kevin Speer, who was not involved in anything.[2]

---

[1]RCW 9A.36.021(1)(c) provides:

"(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

". . . .

"(c) Assaults another with a deadly weapon; . . .".

[2]The court also entered the following written findings of fact and conclusion of law on January 4, 1991:

FINDINGS OF FACT

1. That on August 13, 1989, the respondent, Todd Carlson, a/k/a Muschette, confronted the victim Cliff Ewell with what appeared to Cliff Ewell to be a rifle. It may in fact have been a B-B gun.

On the basis of RCW 13.40.060(2),[3] the court transferred the case to the Skagit County Juvenile Court for the disposition hearing because Carlson was a resident of Skagit County at the time of the fact-finding hearing. The Skagit County Juvenile Court refused to accept the case, and on April 10, 1990, ordered the case transferred back to Snohomish County. Carlson failed to appear at this Skagit County hearing. Carlson's counsel, who was present, failed to object to the order transferring the disposition back to Snohomish County.[4]

On April 18, 1990, 21 days after his conviction, a hearing was held in Snohomish County because jurisdiction for disposition had been transferred back there. Carlson was not present but an attorney was present on his behalf. The court found good cause to extend disposition on the basis that Skagit County had a statutory obligation to accept the disposition hearing. Carlson's counsel did not object to the finding of good cause. The matter was transferred back to Skagit County.

---

2. Respondent pointed the B-B gun or rifle at Cliff Ewell, right between the eyes.
3. That victim Ewell was at that time scared by the rifle or B-B gun.
4. That victim Ewell believed, at the point in time when Respondent aimed the rifle or B-B gun at his face, that it was a deadly weapon.

Based on the above facts, this Court makes the following:

CONCLUSIONS OF LAW

On August 13, 1989, the Respondent did commit Second Degree Assault by aiming a gun at another person, Cliff Ewell, which had the apparent power to be a deadly weapon. Each element of the charge has been proven beyond a reasonable doubt.

[3]RCW 13.40.060(2) provides:

"The case and copies of all legal and social documents pertaining thereto may in the discretion of the court be transferred to the county where the juvenile resides for a disposition hearing. All costs and arrangements for care and transportation of the juvenile in custody shall be the responsibility of the receiving county as of the date of the transfer of the juvenile to such county, unless the counties otherwise agree."

[4]A different attorney represented Carlson at this disposition hearing in Skagit County.

A disposition hearing was held in Skagit County on June 5, 1990. A commissioner sentenced Carlson within the standard range. After sentencing, Carlson was released pending this appeal.

## II

## A

### Assault With a Deadly Weapon

Carlson asserts that the juvenile court erred in convicting him of second degree assault, assault with a deadly weapon, without making a specific finding of fact that the BB gun was a deadly weapon. Committing an assault with something that appears to be a deadly weapon, but which is not, argues Carlson, does not violate RCW 9A.36.021(1)(c).[5]

■ Carlson was charged with assault with a deadly weapon. RCW 9A.04.110(6) defines a "deadly weapon" as:

> any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm[.]

Carlson argues that the BB gun is not a deadly weapon within the meaning of this section. A BB gun is not an explosive nor is it a firearm. Carlson concedes that if the BB gun was capable of firing BB's, it could be considered a deadly weapon as it would be "readily capable of causing death or substantial bodily harm". However, if the juvenile court believed that the BB gun was inoperative, contends Carlson, it could not be considered a deadly weapon. Because the court made no finding on this issue, Carlson contends that the trial court erred in finding him guilty of second degree assault.

■ The current second degree "assault with a deadly weapon" statute, RCW 9A.36.021(1)(c), requires that the assault be committed with a "deadly weapon". This is a change from the previous statutes upon which the case law relied upon by the trial judge was based. The pre-1975

---

[5]See footnote 1 for the text of RCW 9A.36.021(1)(c).

second degree assault statute and the pre-1988 second degree assault statute both contained language defining second degree assault to include knowingly or willfully assaulting another "with a weapon or other instrument or thing likely to produce bodily harm". The pre-1975 statute had been interpreted to reject any notion that a weapon "likely to produce bodily harm" must in fact *be* a deadly weapon.[6] In 1988, the Legislature amended the statute to require that the weapon must be deadly. The Legislature is presumed to know the previous law; therefore, by changing the language of a statute, the Legislature is presumed to intend a change in the law. *Chandler v. Otto*, 103 Wn.2d 268, 274, 693 P.2d 71 (1984).

Because assault is not defined in the criminal code, the courts rely upon the common law definitions of assault, one of which is to place a person in fear of bodily injury by the use of a weapon that has the apparent power to do harm. *State v. Jimerson*, 27 Wn. App. 415, 418, 618 P.2d 1027, *review denied*, 94 Wn.2d 1025 (1980); *State v. Harris*, 69 Wn.2d 928, 936, 421 P.2d 662 (1966).

The 1975-76 revisions to the criminal code included RCW 9A.04.110(6) wherein deadly weapon was defined. However, until 1988, the second degree assault statutes did not require that the instrument or thing used in a second degree assault be "deadly". This changed with the act which became effective July 1, 1988, RCW 9A.36.021(1)(c).

We must now look to RCW 9A.04.110(6) for a definition of deadly weapon. There we find two categories of weapons which are defined as deadly. Category one includes weapons which are deadly *per se*: explosives and loaded *or unloaded* firearms; and category two includes "any other weapon . . . instrument . . . which, under the circumstances in which it is used, . . . or threatened to be used, *is readily capable of causing death or substantial bodily harm*" (italics ours), *i.e.*,

---

[6]*See, e.g., State v. Curtis*, 14 Wn. App. 735, 736, 544 P.2d 768 (stating "[i]t is well settled that the instrument used need not be a *deadly* weapon"), *review denied*, 86 Wn.2d 1012 (1976).

deadly in fact under the circumstances in which the instrument is used or threatened to be used.[7]

█ In assault, the crime itself encompasses the used or threatened to be used language of RCW 9A.04.110(6), but the issue must still be resolved whether the weapon "as used" was "readily capable of causing . . . substantial bodily harm".[8] If a weapon or thing is not deadly per se as defined

---

[7]*Cf. State v. Gotcher*, 52 Wn. App. 350, 759 P.2d 1216 (1988). The issue in the instant case is slightly different from the issue in *Gotcher* which held that, if the weapon is not deadly per se, there must be evidence of *intent to use the instrument to do bodily harm*. In *Gotcher*, the instrument was a switchblade carried by a burglar and the question was whether he was "armed with a deadly weapon" as defined by the relevant burglary statute and RCW 9A.04.110(6).

[8]*Cf. State v. Hentz*, 99 Wn.2d 538, 663 P.2d 476 (1983); *State v. Bowman*, 36 Wn. App. 798, 678 P.2d 1273, *review denied*, 101 Wn.2d 1015 (1984). In *Hentz*, the defendant was convicted of first degree rape, rape by forcible compulsion based on the use of, or threat to use, a deadly weapon. The defendant had threatened to shoot the victim if she did not comply. When the police searched the defendant's apartment, however, they found only a plastic cap pistol which the victim identified. Before trial, the defendant stated to a cell mate that the police had found the wrong gun and that he had used a real gun which he borrowed from a friend.

The defendant appealed, arguing that the first degree rape statute required the State to prove that he possessed a deadly weapon in fact during the rape. The Court of Appeals agreed and reversed his conviction.

On appeal to the Supreme Court, a 4-member plurality of the court reversed the Court of Appeals and reinstated the defendant's conviction for first degree rape, holding that the "credible *threat* to use a deadly weapon in order to force a victim into submission is the conduct the Legislature intended to prohibit in [the first degree rape statute]." *Hentz*, 99 Wn.2d at 541-42. The plurality found that the defendant threatened to shoot the victim while displaying a realistic-looking pistol. 99 Wn.2d at 541. This express threat to shoot, held the plurality, implied that the defendant had access to a firearm. 99 Wn.2d at 541. Such conduct falls within the threat to use a deadly weapon of the first degree rape statute.

A fifth member of the court, Justice Dore, concurred on the basis of the cell mate's testimony that the defendant had told him that he had used a real gun. *Hentz*, 99 Wn.2d at 546. Justice Dore stated that a real gun would satisfy the definition of a deadly weapon under RCW 9A.04.110(6), whereas a toy gun would not. *Hentz*, 99 Wn.2d at 546.

Four members of the court dissented, arguing that a cap gun cannot be considered a deadly weapon within the meaning of the first degree rape statute and RCW 9A.04.110(6) as it is not "readily capable of causing death or serious bodily injury". *Hentz*, 99 Wn.2d at 547.

In *Bowman*, the defendant was convicted of first degree rape. On appeal, the defendant argued that the record failed to support the finding that he was armed with a firearm. *Bowman*, 36 Wn. App. at 804. This court, in dicta, relied

in RCW 9A.04.110(6), whether it is nevertheless deadly in the circumstances in which it was used, *i.e.*, whether it is "readily capable of causing substantial bodily harm" becomes a question of fact.[9] *See State v. Sorenson*, 6 Wn. App. 269, 273, 492 P.2d 233 (1972) (stating that whether a knife with a blade shorter than 3 inches is deadly is a question of fact to be determined by the knife's capacity to inflict death and the circumstances in which it is used).

The State argues that pre-1988 case law still applies because the Legislature has not defined assault and this court must still look to the common law for the definition of assault and that definition includes putting someone in apprehension. Although we agree with the State that we must still look to the common law for the definition of assault and that that definition includes putting someone in apprehension, this does not answer the question presented in the instant appeal, *i.e.*, if an assault was committed was it second degree assault or fourth degree assault? It is certainly logical that the Legislature may have intended to reserve the more severe penalty of class B felony to those who assault with a *deadly* weapon, a weapon that is *actually readily capable of producing bodily harm*, reserving the "apparently capable" situations for gross misdemeanor status.

---

on *Hentz* to reject the defendant's argument that the State must prove that he was armed with a gun in fact, stating that a defendant's credible threat to use a deadly weapon although armed only with a toy gun will support a first degree rape conviction. *Bowman*, 36 Wn. App. at 804. The court upheld the defendant's first degree rape conviction holding that "[b]ecause the record contains sufficient evidence to support the jury's special verdict that Bowman was armed with an actual weapon, it also establishes a fortiori that Bowman's threats were credible." *Bowman*, 36 Wn. App. at 804.

[9]This is also true with respect to the deadly weapon sentence enhancement statute and case law. *See* RCW 9.95.040(2); *State v. Pam*, 98 Wn.2d 748, 753, 659 P.2d 454 (1983) (holding that, to enhance a punishment, a defendant must be armed with a deadly weapon in fact), *overruled on other grounds in State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906 (1989); *State v. Tongate*, 93 Wn.2d 751, 755, 613 P.2d 121 (1980) (holding RCW 9.95.040 requires the presence of a deadly weapon in fact for the sentence enhancement provision to operate). The enhanced sentence cases thus provide some guidance with respect to the apparent intent of the Legislature when it amended RCW 9A.36.021(1)(c) effective in 1988.

This appears to be the intent of the Legislature. To the extent that the second degree assault statute is ambiguous, however, as it is a criminal statute, we are required by the rule of lenity to construe it most favorably to the accused. *State v. Workman*, 90 Wn.2d 443, 454, 584 P.2d 382 (1978).

As conceded by Carlson, an *operative* BB gun *can* be a deadly weapon, especially if aimed between the eyes. Even an *unloaded* BB gun, if used in such a circumstance that it could be readily loaded by the assailant, could be "readily capable". The fact that the safety may have been on would not reduce the ready capability of an operative BB gun to inflict harm. But here, the gun was not in evidence[10] and the only testimony with respect to the "readily capable" issue came from Carlson, when he testified:

Q: . . . Did the BB gun operate?
A: No. The safety switch was on, too.
Q: It was incapable of taking BBs?
A: It was incapable. The barrel is sawed off and it doesn't work. There's even tape on it. It's a rifle.
Q: Was there tape on the front of — over the tip of the barrel?
A: No. There wasn't tape over the tip of the barrel. There was tape on the little thing where the BBs go in.

■ The trier of fact surely could have chosen to disbelieve and clearly the court did not *fully* believe Carlson; however, the court found Carlson credible enough to find that the gun may have been a BB gun. On the record before this court there is a reasonable doubt as to whether the gun was in fact "readily capable" as the record contains no substantial evidence that it was. Carlson admitted using the gun with the intent to intimidate and there can be no reasonable doubt that *an assault* was committed here. Because there is a reasonable doubt that the weapon was deadly, however,

---

[10]Although the gun looked like a rifle to the youthful victim and youthful witness, there was clearly a reasonable doubt as to whether the gun was a "firearm". The trial court found that the gun may in fact have been a BB gun.

WPIC 2.10 defines "firearm" as a "weapon from which a projectile may be fired by an explosive such as gun powder." A BB gun is not a firearm, therefore, it is not a deadly weapon per se. A BB gun may be deadly as a matter of law to the extent that there is no issue of fact that the gun was operative and used, or threatened to be used, in such a manner that it is "readily capable of causing substantial bodily harm".

these facts only support a finding beyond a reasonable doubt that Carlson committed an assault in the fourth degree.[11]

## B
### Speedy Disposition

Carlson next argues that, because a disposition hearing was not held within 21 days of his fact-finding hearing as required by JuCR 7.12(a)[12] and RCW 13.40.130(8),[13] his sentencing should have been indefinitely stayed or the case dismissed.

The Snohomish County Juvenile Court found that Carlson committed second degree assault on March 29, 1990. Snohomish County transferred the case to the Skagit County Juvenile Court for the disposition hearing because Carlson was a resident of Skagit County at the time of the fact-finding hearing. *See* RCW 13.40.060(2).[14] The Skagit County Juvenile Court refused to accept the case, and on April 10, 1990, ordered it transferred back to Snohomish County. In the order transferring disposition, the court

---

[11]The fourth degree assault statute, RCW 9A.36.041, provides:

"(1) A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial arrest, he or she assaults another.

"(2) Assault in the fourth degree is a gross misdemeanor."

[12]JuCR 7.12(a) provides:

"**(a) Time.** A disposition hearing shall be held if the juvenile has pleaded guilty or has been found guilty by the court. The hearing may be held immediately following the juvenile's plea of guilty or immediately following the adjudicatory hearing if found guilty by the court. The disposition hearing may be continued for a period of up to 14 days after the plea or the conclusion of the hearing if the juvenile is held in detention, or 21 days after the plea or the conclusion of the hearing if the juvenile is not held in detention. Either time may be extended by the court for good cause shown. Notice of a continued hearing shall be given to all parties in accordance with rule 11.2."

[13]RCW 13.40.130(8) provides:

"(8) The disposition hearing shall be held within fourteen days after the adjudicatory hearing or plea of guilty unless good cause is shown for further delay, or within twenty-one days if the juvenile is not held in a detention facility, unless good cause is shown for further delay."

[14]See footnote 3 for the text of RCW 13.40.060(2).

entered a clause "finding that good cause is shown to continue the date of the Disposition Hearing to effectuate the transfer of files, pursuant to JuCR 7.12".

On April 18, 1990, 21 days after his conviction, a hearing was held in Snohomish County because jurisdiction for disposition had been transferred back. Carlson was not present but an attorney, Joseph Zvaleuskas, was present on his behalf. The court found good cause to extend disposition on the basis that Skagit County had a statutory obligation to accept the disposition hearing.[15] Carlson's counsel did not object to the finding of good cause.[16]

---

[15]The following colloquy took place between the State and the court:
"[MS. CRAWLEY:] It's my understanding that today's date is the 21st da[y] from the date of conviction [of] being found guilty in the Court. I don't believe at the time this Court sent the matter to Skagit County, speedy disposition was waived. My recollection from looking at the materials received back from Skagit County, is that there was a standard clause in the materials sent back indicating the Court found good reason to extend the time period for the Dispositional Hearing. I wasn't sure whether the Court was inclined to accept this matter back, but I did feel that in the event we might eventually hear this case, that we needed to go on the record so that the circumstances were clear and that the Court could make a finding that the time period needed to be extended under these unusual circumstances. So that's the reason the matter's on today.
"THE COURT: For the record, the Court has no desire to have this matter back. I think the actions of Skagit County are incorrect. They have obligation statutory to make this [dis]position. That is why we transferred it in the first place, since the residence of the boy was in Skagit County. And I think the unilateral action is unfortunate. I haven't looked through all the paperwork, but if the packet does contain the rational[e] of extending the period of time for sentencing, it was probably done on the basis of the logistics that were involved. I find good cause and actually find good law because of the actions taken by Skagit County, which I just can't understand. I want to have the matter sent back forthwith."

[16]Not only did Carlson's counsel fail to object to this finding, but he stated: "I don't really think it's necessary for your Honor to find good cause in that the Order transferring it back — my position in this matter is as your Honor stated, that you properly sent it up to Skagit County. They're the ones that are dealing with that now. And when they up there with their situation — they found good cause to delay it and send it back here. I mean, I don't really even think the whole matter is proper before this Court. And that, you know, any situation that's going on in Skagit County I think that it's basically their problem. And,

A disposition hearing was held in Skagit County on June 5, 1990, 47 days after the fact-finding hearing. At the disposition hearing, the court denied Carlson's motion to dismiss based on delay in disposition. Even though Skagit County may have improperly declined jurisdiction, we note that Carlson's counsel failed to object in Skagit County to the finding of good cause and to the transfer of disposition back to Snohomish County. At the Snohomish County hearing which then followed, Carlson's counsel not only did not object to the finding of good cause but also opined that no such finding was necessary.

Even assuming that good cause has not been shown, Carlson has not claimed that he was in any way prejudiced by the delay in his sentencing. Although RCW 13.40.130(8) and JuCR 7.12(a) provide that, if a juvenile is not held in a detention facility, a disposition hearing shall be held within 21 days of an adjudicatory hearing unless good cause is shown for the delay, neither the statute nor the rule imposes a sanction or provides a remedy for violation.

■ In *State v. Eugene W.*, 41 Wn. App. 758, 761, 706 P.2d 235, *review denied*, 104 Wn.2d 1025 (1985), the court held that a juvenile must show prejudice before a remedy will be imposed for a violation of JuCR 7.12(a) and RCW 13.40-.130(8). In *Eugene W.*, the court acknowledged that the record was "devoid of any request for a continuance, much less of a showing of good cause. This juvenile simply fell through the cracks and was lost in the system." 41 Wn. App. at 760. Because the juvenile suffered no prejudice, however, the court found no reversible error. 41 Wn. App. at 761.[17]

---

you know, I don't really believe that it's necessary for [you] to find good cause because, like you said, I believe they are outside their statutory authority just to send it back for whatever reason. I would just like to be on the record, and that's our position, your Honor."

[17]Carlson requests that this court reject *Eugene W.* and instead follow the reasoning of *Spokane v. Holmberg*, 50 Wn. App. 317, 323-24, 745 P.2d 49 (1987), *review denied sub nom. Box v. Grant Cy. Dist. Court*, 110 Wn.2d 1013 (1988),

Thus, we hold that no reversible error was committed in the instant case where Carlson suffered no prejudice by the delay in sentencing.

We reverse the judgment as to the second degree assault. We remand to the Snohomish County Juvenile Court for entry of judgment of guilty of fourth degree assault and for the Snohomish County Juvenile Court to determine whether resentencing should occur in Snohomish or Skagit County.

SCHOLFIELD and BAKER, JJ., concur.

Review denied at 119 Wn.2d 1022 (1992).

---

where the court held that Breathalyzer test results should have been suppressed when the arresting officers failed to adequately warn the defendants of the consequences of their refusal to take the test. The court reasoned that "[s]ociety is penalized when officers derogate from the mandates of the Legislature." 50 Wn. App. at 324. Carlson argues that society is better served by requiring strict compliance with RCW 13.40.130(8) and JuCR 7.12(a) rather than requiring a juvenile to show actual prejudice.

Carlson's argument is not persuasive. Had the Supreme Court intended strict compliance or dismissal with respect to JuCR 7.12(a), and had the Legislature intended strict compliance or dismissal with respect to RCW 13.40.130(8), the Supreme Court and the Legislature presumably would have so provided. *Cf.* JuCR 7.8(g) (providing that if an adjudicatory hearing is not held within 60 days of the arraignment, "the information shall be dismissed with prejudice.").

Similarly, Carlson's reliance on *State v. Lindbo*, 94 Wn.2d 112, 614 P.2d 1277 (1980) is also not persuasive. *Lindbo* involved a violation of speedy trial rights and the court rule setting the time limits expressly allowed dismissal as a sanction for violation of speedy trial rights. 94 Wn.2d at 114.