[No. 33403-8-II.   Division Two.   August 8, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. ANDREW J. DAVID, *Appellant*.

472

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*Deborah S. Kelly, Prosecuting Attorney*, and *Jill Landes, Deputy*, for respondent.

¶1 HUNT, J. — Andrew David appeals his conviction and sentence for vehicular homicide, resulting from his speeding vehicle's collision with another vehicle while driving with his blood alcohol level at twice the legal limit. He argues that (1) the vehicular homicide statute violates the separation of powers doctrine, (2) the trial court abused its

discretion when it (a) admitted into evidence a photograph of the victim when she was alive and unharmed and (b) refused to admit into evidence the victim's toxicology report, (3) the trial court failed to instruct the jury on how to determine whether a blood test is valid, (4) the prosecutor committed misconduct during closing argument, and (5) his exceptional sentence violated *Blakely*.[1]

¶2 In his statement of additional grounds for review,[2] David also argues that his trial counsel rendered ineffective assistance, his conviction violated the constitutional prohibition of ex post facto laws, and he was denied his right to a speedy trial. We affirm.

## FACTS

### I. VEHICULAR HOMICIDE

¶3 One late summer afternoon, Lorna Kuhlman was driving east on Highway 101 near her home in Sequim. Along the same stretch of highway, intoxicated Andrew David was driving west 25 m.p.h. or so above the posted 45 m.p.h. speed limit. Kuhlman entered the left turn lane at the highway's intersection near the Dungeness River Bridge. As she began turning left across the westbound lanes of Highway 101, David crashed into the passenger side of her car, killing her, injuring himself, and rendering himself unconscious.

¶4 A witness who came to David's assistance smelled alcohol on his breath. State Trooper Richard Ward also smelled a strong odor of alcohol coming from David's vehicle and body. An aid crew rushed David to the hospital.

¶5 After David regained consciousness, Ward read him his *Miranda*[3] rights, which David waived. Ward arrested David for vehicular homicide, read him a "special evidence

---

[1] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[2] RAP 10.10.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

warning,"[4] and, with the assistance of medical personnel, drew David's blood to test his blood-alcohol content. The resulting toxicology report revealed that, at the time of the crash, David had a blood alcohol level of 0.16 grams per hundred milliliters.

¶6 Six days later, a Washington State toxicologist tested Kuhlman's blood during her autopsy. These blood tests revealed a blood-alcohol content of 0.02 grams per hundred milliliters, possibly attributable to postmortem decomposition, and the presence of the following medications: carisoprodol, hydrocodone, meprobamate, paroxetine, diphenhydramine, acetaminophen, and chlorpheniramine.[5]

## II. PROCEDURE

¶7 The State charged David with vehicular homicide, alleging two theories—that David drove recklessly and that he drove while under the influence of alcohol. The second theory also supported enhancement of David's sentence based on his four prior driving under the influence (DUI) convictions.

### A. Proposed Bifurcation for Sentencing

¶8 David asked the court to bifurcate his jury trial and sentencing proceedings if the State planned to seek an enhanced sentence based on his prior DUI convictions. The trial court denied this request, reasoning that it could impose the sentencing enhancement based on David's prior convictions without a jury finding on this issue.

---

[4] This "special evidence warning" explains to arrestees for alcohol-related crimes their legal rights concerning blood-alcohol-level tests.

[5] David does not contend that these substances were illegal drugs. On the contrary, the record indicates that Kuhlman obtained these medications either by prescription or over the counter.

## B. Evidentiary Rulings

### 1. Victim's toxicology report

¶9 At trial, David offered into evidence Kuhlman's Washington State Patrol "Death Investigation Toxicology Report" to prove his theory that Kuhlman drove at a "snail's pace" of five mph across the intersection because she was intoxicated, thereby contributing to the accident. In his offer of proof, David presented Kuhlman's autopsy toxicology report, which listed seven medications in her system and a low blood-alcohol level, potentially attributable to postmortem decomposition. David then read from the *Physician's Desk Reference* and on-line information about the side effects of the medications in Kuhlman's system, asserting that they cause drowsiness and dizziness and carry warnings to use caution while driving. David did not include in his offer of proof any expert testimony to explain how the presence of these medications in Kuhlman's blood might have affected her driving.[6]

¶10 David argued that the toxicology report showed that (1) Kuhlman was the sole proximate cause of the crash because she was intoxicated and violated his right of way or (2) he was not reckless because a reasonable person could not have foreseen that a person would drive as slowly as Kuhlman did when she crossed the intersection. Without commenting on the sufficiency of David's offer of proof, the trial court excluded the toxicology report as irrelevant. It reasoned that "all of the tests [for] superseding cause are from the standpoint of the defendant—what would the defendant have reasonably anticipated—and the reasons why an individual might have violated the rules of the road in any respect are relatively unimportant." Report of Proceedings (RP) (Apr. 11, 2005) at 107-08.

¶11 The trial court did allow David (1) to present evidence of the manner in which Kuhlman had driven, (2) to

---

[6] David told the court that he would later provide an expert to present this information, but he never did so.

present evidence that she had violated the rules of the road, and (3) to argue that he was not the proximate cause of Kuhlman's death. Jeffery Taylor, an accident witness, testified that Kuhlman's car "was coming at a slow rate of speed, just creeping out there," and that her car "just slowly came across" the intersection.

## 2. "In-life" photograph of victim

¶12 The State offered into evidence an "in-life"[7] photograph of Kuhlman. David objected. The State argued that the photograph was relevant because "the State does indeed have a right to present this was the person who was killed. It's a real life human being." RP (Apr. 11, 2005) at 80. Cautioning the State to discuss the photograph only briefly and to avoid a plea to the jury's passion or prejudice, the trial court admitted the photograph into evidence.

## C. Jury Instructions

¶13 David requested an instruction defining the methods the jury should use to determine whether the blood tests were accurate.[8] Ruling that David's proposed instruction related "more to the admissibility of the evidence rather than the weight," the trial court declined to give it. RP (Apr. 14, 2005) at 11-12.

¶14 Without objection, the trial court instructed the jury on (1) a driver's general duty to use ordinary care while on a public highway; (2) the special duty required of a driver turning left at an intersection; (3) proximate causation;

---

[7] "In-life" describes a photograph taken while Kuhlman was alive, distinguished from a postmortem photograph.

[8] David proposed the following instruction:

To be considered valid an analysis of a person's blood must have been performed according to methods approved by the state toxicologist.

In evaluating any evidence of blood testing, you shall take into account the manner in which any test was conducted, including the handling of any samples prior to testing as well as whether there was compliance with the procedures set by the state toxicologist.

Suppl. Clerk's Papers at 45.

and (4) a "superseding intervening cause," to which David objected.

## D. Closing Arguments

¶15 During closing argument, David argued to the jury, "If [the prosecutor in closing arguments] brings up stuff that was not talked about you have to think of what her motives are." RP (Apr. 14, 2005) at 43-44. The trial court overruled the State's objection. RP (Apr. 14, 2005) at 43-44.

¶16 In rebuttal, the prosecuting attorney argued, "[M]y motive is to [e]nsure that justice is done. I don't have any other [u]lterior motive." "I submit the true theory of the case, it's exactly what happened." RP (Apr. 14, 2005) at 65. David did not object.

## E. Verdict

¶17 The trial court gave the jury an interrogatory, special verdict form that asked, "Has the jury found unanimously that at the time of causing the injury, the defendant was operating the motor vehicle (a) [w]hile under the influence of intoxicating liquor? [or] (b) in a reckless manner?" Suppl. Clerk's Papers at 23. The jury answered, "Yes," to both questions. The jury also found David guilty of vehicular homicide.

## F. Sentence

¶18 At sentencing, the trial court determined that (1) David had an offender score of zero, (2) David had four prior DUI convictions, and (3) his unenhanced standard range sentence for vehicular homicide was 31 to 41 months. But David's four prior DUI convictions increased his standard sentencing range by 96 months. The trial court sentenced

David to 132.5 months confinement, sentencing him in the middle of the standard sentencing range.[9]

¶19 David appeals.

## ANALYSIS

### SEPARATION OF POWERS

¶20 David's argument presents an issue of first impression. He first argues that the vehicular homicide statute, RCW 46.61.520, violates the separation of powers doctrine because the statute (1) fails to define the essential elements of the offense, specifically, proximate causation, and (2) thus requires the courts to supply missing definitions, which is an improper delegation of legislative authority to the judiciary. We disagree.

■ ¶21 A fundamental principle of our American constitutional system is that governmental powers are divided among three separate and independent branches—legislative, executive, and judicial. *State v. Osloond*, 60 Wn. App. 584, 587, 805 P.2d 263, *review denied*, 116 Wn.2d 1030 (1991). Our Washington State Constitution does not contain a formal separation of powers clause. Nonetheless, separation of powers is a vital doctrine, presumed throughout our state history from the division of our state government into three separate branches. *Carrick v. Locke*, 125 Wn.2d 129, 134-35, 882 P.2d 173 (1994).

■ ■ ¶22 The separation of powers doctrine serves mainly to ensure that fundamental functions of each branch of government remain inviolate. *Carrick*, 125 Wn.2d at 135. This doctrine is violated when " 'the activity of one branch threatens the independence or integrity or invades

---

[9] The State originally erred in calculating David's standard sentencing range, using an offender score of one, resulting in a standard range of 36-48 months. David's offender score should have been zero, which would have resulted in a standard range of 31-41 months. When David raised this issue at the sentencing hearing, the trial court modified its original sentence to 36.5 months with a 96-month enhancement for his four prior DUI convictions. David does not appeal the calculation of his sentencing range.

the prerogatives of another.'" *State v. Moreno*, 147 Wn.2d 500, 505-06, 58 P.3d 265 (2002) (quoting *Carrick*, 125 Wn.2d at 135).

■ ¶23 There are several categories of separation of powers violations, two of which are relevant here. A statute potentially violates the separation of powers doctrine if it (1) allows the judiciary to encroach on legislative functions (*State v. Wadsworth*, 139 Wn.2d 724, 734, 991 P.2d 80 (2000)) or (2) improperly delegates core legislative functions to the judiciary (*Sackett v. Santilli*, 146 Wn.2d 498, 504-05, 47 P.3d 948 (2002)).

■ ¶24 At the same time, however, the separation of powers doctrine is grounded in flexibility and practicality; rarely does it offer a definitive boundary beyond which one branch may not tread. *Carrick*, 125 Wn.2d at 135. Thus, the separation of powers doctrine does not mandate that the three branches of government seal off hermetically from one another. *Carrick*, 125 Wn.2d at 135. Rather, the different branches remain partially intertwined to maintain an effective system of checks and balances, as well as an effective government. *Carrick*, 125 Wn.2d at 135.

■ ¶25 In analyzing a possible separation of powers violation, it is helpful to examine both the history of the challenged practice and the challenged branch's tolerance of analogous practices. *Carrick*, 125 Wn.2d at 136. Although deeply embedded traditional ways of governing cannot supplant the Constitution or legislation, tradition does give meaning to the words of the Constitution and statutes. *Carrick*, 125 Wn.2d at 136. Thus, a long history of cooperation between or among governmental branches in any given instance tends to militate against finding a separation of powers violation. *Carrick*, 125 Wn.2d at 136.

## A. Standard of Review

■ ¶26 We assume that the legislature considers the constitutionality of its enactments; thus, the legislature is entitled to some deference. *Island County v. State*, 135

Wn.2d 141, 147, 955 P.2d 377 (1998). Because courts presume that a statute is constitutional, the burden is on the challenging party to prove beyond a reasonable doubt that it is unconstitutional. *State ex rel. Peninsula Neighborhood Ass'n v. Dep't of Transp.*, 142 Wn.2d 328, 335, 12 P.3d 134 (2000). Thus, it is for the judiciary ultimately to decide whether the legislature had the constitutional power to enact a given statute and whether the statute violates a constitutional mandate. *Peninsula Neighborhood Ass'n*, 142 Wn.2d at 335.

### B. Vehicular Homicide Statute and Common Law Definition of Proximate Cause

¶27 Under RCW 46.61.520(1), a driver is guilty of vehicular homicide while operating a motor vehicle (1) "[w]hen the death of any person ensues within three years as a proximate result of injury *proximately caused* by the driving of any vehicle by any person" and (2) when the driver was under the influence of an intoxicant, was reckless, or disregarded the safety of others. (Emphasis added.) Although the legislature did not define "proximate causation,"[10] it did enact a saving clause, mandating that "[t]he provisions of the common law relating to the commission of crime and the punishment thereof, insofar as not inconsistent with the Constitution and statutes of this state, shall supplement all penal statutes of this state . . . ." RCW 9A.04.060 (LAWS OF 1975, 1st Ex. Sess., ch. 260).

### 1. No judicial encroachment on legislative powers

¶28 David first argues that (a) defining an essential element of a criminal statute is properly a legislative function and, therefore, (b) incorporating the common law definition of "proximate causation" into the vehicular homi-

---

[10] At least three other statutes also refer to "proximate causation": RCW 62A.4-402 "wrongful dishonor," RCW 70.122.080 "withdrawal of life sustaining procedures," and RCW 7.72.030 "products liability." As with RCW 46.61.520(1), the legislature did not define "proximate causation" in these other statutes.

cide statute is an improper judicial encroachment on legislative powers. This argument fails.

¶29 David incorrectly interprets our Supreme Court's pronouncement that "[i]t is the function of the legislature to define the elements of a crime." Br. of Appellant at 17 (citing *Wadsworth*, 139 Wn.2d at 734). David takes this quotation out of context, contending that it means the legislature must provide a statutory definition for every element of every crime. Such is not the law.

¶30 When our Supreme Court ruled that the legislature defines the elements of a crime, it meant that the legislature must set out in the statute the essential elements of a crime. *See Wadsworth*, 139 Wn.2d at 734. For example, the legislature must determine whether a particular mental state is an essential element of a crime. *State v. Bash*, 130 Wn.2d 594, 604, 925 P.2d 978 (1996).

¶31 It has never been the law in Washington that courts cannot provide definitions for criminal elements that the legislature has listed but has not specifically defined. Nor has this practice generally been viewed as a judicial encroachment on legislative powers.[11] On the contrary, the judiciary would be acting contrary to the legislature's legitimate, express expectations, as well as failing to fulfill judicial duties, if the courts did not employ long-standing common law definitions to fill in legislative blanks in statutory crimes. The legislature is presumed to know this long-standing common law. *State v. Carlson*, 65 Wn. App. 153, 158, 828 P.2d 30, *review denied*, 119 Wn.2d 1022 (1992).

¶32 By enacting RCW 9A.04.060 in 1975, the legislature indicated its intent "to continue the then-existing" practice of judicially defining "proximate causation." *See State v. Smith*, 72 Wn. App. 237, 241, 864 P.2d 406 (1993) (holding that RCW 9A.04.060 expresses the legislature's

---

[11] Furthermore, in those instances where the court has misperceived the legislature's intent or expectations, the legislature systematically enacts corrective statutes, sometimes expressly noting a specific judicial opinion that it intends a particular statute to supersede.

intent to continue the common law rule of "legal efficacy"[12] in effect in 1975).[13] Therefore, in omitting a statutory definition of "proximate causation" when it promulgated RCW 46.61.520 (establishing the crime and elements of vehicular homicide) in 1975, the legislature implied that the judiciary should continue to define "proximate causation" according to common law principles, just as the judiciary had done before 1975, when the legislature enacted the saving clause. *See* RCW 9A.04.060. In this way, the courts follow, rather than subvert, the legislature's mandate.

### 2. No improper legislative delegation to judiciary

¶33 David similarly argues that the legislature cannot delegate to the judiciary its power to define essential elements of a crime. This argument similarly fails.

¶34 We agree with David that the legislature may not delegate its *purely* legislative functions. *Diversified Inv. P'ship v. Dep't of Soc. & Health Servs.*, 113 Wn.2d 19, 24, 775 P.2d 947 (1989). But he fails to show that defining an essential element of a crime is a purely legislative function.[14] On the contrary, as we note above, the legislature has historically left to the judiciary the task of defining some criminal elements, an arena in which the legislature has no "definitive boundary beyond which [the courts] may not tread." *Carrick*, 125 Wn.2d at 135. *See Wadsworth*, 139 Wn.2d at 736-37 (discussing legislative delegation that does not violate the separation of powers doctrine).

---

[12] "[U]nder RCW 9A.04.060, the rule of legal efficacy is a 'provision[ ] of the common law' that 'shall supplement all penal statutes of this state'. " *Smith*, 72 Wn. App. at 241 (quoting RCW 9A.04.060).

[13] Before 1975, our Supreme Court ruled on the common law meaning of "proximate causation" in the context of the vehicular homicide statute. *State v. Jacobsen*, 74 Wn.2d 36, 37-38, 442 P.2d 629 (1968).

[14] To support this proposition, David points only to his interpretation of *Wadsworth*, incorrectly asserting that the legislature must write a definition for each criminal element. Br. of Appellant at 17 (citing *Wadsworth*, 139 Wn.2d at 734).

 ¶35 Accordingly, we hold that RCW 46.61.520 is not an unconstitutional violation of the separation of powers doctrine.

¶36 Affirmed.

¶37 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

VAN DEREN, A.C.J., and ARMSTRONG, J., concur.

Review denied at 160 Wn.2d 1012 (2007).