# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53081-3-II |
| Respondent, | |
| v. | |
| JAMES GARRETT BALDWIN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – James Garrett Baldwin appeals from his jury trial conviction for second degree assault with a deadly weapon. He argues that (1) the evidence was insufficient to prove that a 12 to 14 inch weighted club was a deadly weapon and (2) the trial court erred by admitting under ER 609(a) evidence of Baldwin's two prior convictions for violating domestic violence no-contact orders. In a statement of additional grounds for review[1] (SAG), Baldwin further contends that he acted in self-defense. Because the evidence is sufficient to prove that the club was a deadly weapon, any error in admitting the prior offenses for impeachment purposes was harmless, and Baldwin's SAG claim has no merit, we affirm.

---

[1] RAP 10.10.

## FACTS

### I. BACKGROUND

Following an altercation between Baldwin, his former roommate Allen Phillips, and their friend Michael Laumen, the State charged Baldwin with the second degree assault of Phillips. The State also alleged that the assault was a domestic violence offense. Baldwin pleaded not guilty, and the case proceeded to a jury trial.

### II. TRIAL

A. TESTIMONY

1. LAUMEN

Laumen testified that Phillips had been living with Baldwin but had left Baldwin's and moved in with him (Laumen) shortly before the incident. Around 10:00 or 11:00 PM, on the night of the incident, Laumen received a text message from Baldwin asking Laumen to tell Phillips to come by and pick up his "food card" and mail. Verbatim Report of Proceedings (VRP) (Nov. 6, 2018) at 34.

Laumen stated that he and Phillips arrived at Baldwin's about an hour or hour and a half after receiving the text message. They knocked on the door and woke Baldwin, who answered the door and invited them in. Phillips asked for his "food card" and mail, but Baldwin refused to give them to him. *Id.* at 35.

When Phillips asked Baldwin why he would not give him his mail, Baldwin picked up a 12 to 14 inch long "fish club" "and started hitting [Phillips] really hard in the head" with the club. *Id.* Laumen was not sure how many times Baldwin struck Phillips, but Laumen testified that he "thought for sure [Baldwin] was going to kill [Phillips], with the sound that it made and

everything." *Id.* at 38. Laumen also testified that the club looked like it was capable of rendering Phillips unconscious and that he "thought for sure [Phillips] would be unconscious." *Id.* at 39.

Laumen grabbed the club and told Baldwin to stop. Baldwin pulled out a knife, and Laumen let go of the club. Baldwin then approached Laumen with the knife and threatened to kill him.

Baldwin chased Laumen into the yard. When Baldwin returned to his residence, Laumen called the police. Deputies arrived about 20 minutes later.

Laumen stated that he was surprised Phillips was able to walk out of Baldwin's residence with the deputies. Laumen noted that when Phillips came out, he appeared "dazed and confused," "he was . . . holding his head," and he "had this look in his eye, like, he had been hit with a club." *Id.* at 40.

2. PHILLIPS

Phillips testified that he and Laumen arrived at Baldwin's residence around 2:00 AM at Baldwin's invitation. Once inside, Baldwin refused to give Phillips his mail or food card.

Baldwin then walked over to Phillips and started to hit him in the head with a club. When Laumen tried to stop Baldwin, Baldwin "turned his attention to [Laumen] and ushered him out the door." *Id.* at 49.

Baldwin returned and "showed" a hunting knife to Phillips, "in a threatening kind of manner." *Id.* Baldwin then put the knife "somewhere," sat in a chair, and started to talk to Phillips. *Id.* at 51. Phillips testified that Baldwin told Phillips that he was better off living with Baldwin and that the others just wanted Phillips's money.

Phillips testified that he remembered Baldwin hitting him three times "for sure," but he did not know if he lost consciousness when Baldwin struck him. *Id.* at 54. Phillips stated that "had

some lumps" or "a goose egg" where Baldwin had hit him on his head but that his injuries were not serious enough for him to go to the hospital. *Id.* at 53-54. Phillips denied suffering any lasting injuries, noting that the lumps faded away.

Phillips also identified the club, noting that it was a "[f]ish club," the type of club used to kill fish. *Id.* at 56. He testified that there was lead in one end of the club and that Baldwin struck him with the weighted end of the club. The jury was able to take the club with it when it deliberated the case.

### 3. DEPUTY DAN WELLS

Grays Harbor County Deputy Sheriff Dan Wells testified that he was one of the officers who responded Baldwin's residence. When Wells arrived, Laumen told Wells that Phillips was inside the residence and that Phillips had been struck in the head with a club several times. Laumen was "clearly concerned about [Phillips's] condition." *Id.* at 60-61.

Wells and the other deputies who had arrived knocked on the front and back doors of the residence and announced themselves. When no one responded, they started to force entry, but Baldwin eventually opened the door.

After Baldwin came outside and the deputies handcuffed him, Wells and another deputy went inside to check on Phillips. They found Phillips sitting on the couch.

Wells testified that Phillips "was conscious, but he was pretty slow in all of his movements, and his reaction to [the deputies], it just didn't seem to fit well." *Id.* at 66. Wells was concerned about Phillips's condition because he had been repeatedly hit on the head.

Phillips insisted that he wanted to sit in the patrol car "so that he could be away from Mr. Baldwin" and they could speak. *Id.* Wells walked Phillips to the patrol car. Because Phillips's

"responsiveness was very slow, and a little sluggish," Wells called an ambulance. *Id.* Wells found a club about 15 yards from the residence.

### 4. BALDWIN

Baldwin was the sole defense witness. He admitted to having contacted Laumen before the incident, but he asserted that he contacted Laumen at about 3:00 PM not at 10:00 or 11:00 PM.

Baldwin further testified that Phillips and Laumen arrived unexpectedly at his residence later that night when he was sleeping and that they came into his residence without knocking or asking permission to enter and surprised him. Baldwin denied hitting anyone with a club, but he admitted that he pulled a knife on Laumen and asserted that he (Baldwin) was merely defending himself.

Baldwin stated that after Laumen left, he (Baldwin) noticed Phillips sitting on his couch. Baldwin denied touching Phillips and testified that he just told Phillips he was not feeling good and was going to lay back down and talk to Phillips in the morning. The next thing Baldwin knew the deputies were pounding on his door.

### B. ADMISSION OF BALDWIN'S PRIOR CONVICTIONS

After this testimony, the State moved to impeach Baldwin with two prior convictions for felony domestic violence no-contact order violations that occurred in 2011 and in 2014. Baldwin argued that this evidence should not be admitted for impeachment purposes because the two offenses were not crimes of dishonesty and had no probative value.

The trial court considered whether the prior convictions were admissible under ER 609(a)(1) by examining the six *Alexis* factors: "(1) the length of the defendant's criminal record; (2) remoteness of the prior conviction; (3) nature of the prior crime; (4) the age and circumstances

of the defendant; (5) centrality of the credibility issue; and (6) the impeachment value of the prior crime." *State v. Alexis*, 95 Wn.2d 15, 19, 621 P.2d 1269 (1980). Although the trial court stated that it did not understand how to evaluate factors (1) and (6)—the length of Baldwin's criminal record or the impeachment value of the prior crimes—the trial court ruled that the other four factors weighed in favor of admitting the two prior convictions for impeachment purposes.

On cross-examination, the State asked Baldwin if he had been convicted of two "felony violation[s] of a court order," and Baldwin stated that he had but that these violations had involved his former wife. VRP (Nov. 6, 2018) at 84. The State did not mention what type of violations these were or that they involved domestic violence orders.

C. LIMITING INSTRUCTION AND VERDICT

The trial court instructed the jury that evidence that Baldwin had been convicted of other crimes could be considered only for the purpose of evaluating the weight and credibility of his testimony.

The jury found Baldwin guilty of second degree assault. Baldwin appeals his conviction.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Baldwin first argues that the evidence was insufficient to prove that the club was a deadly weapon. We disagree.

A. LEGAL PRINCIPLES

Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of

insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201.

As charged here, "[a] person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: . . . [a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c). When, as is the case here, a weapon is not classified as a per se deadly weapon,[2] the State must prove that the weapon was readily capable of causing death or substantial bodily harm under circumstances in which it is used. RCW 9A.04.110(6); *State v. Carlson*, 65 Wn. App. 153, 159-60, 828 P.2d 30 (1992). These circumstances include the degree of force used, the part of the body where applied, the potential or actual injuries inflicted, and the intent and present ability of the user. *State v. Hoeldt*, 139 Wn. App. 225, 230, 160 P.3d 55 (2007); *State v. Shilling*, 77 Wn. App. 166, 171, 889 P.2d 948 (1995).

"'Substantial bodily harm'" is a bodily injury that "involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). And "substantial," as used in RCW 9A.36.021, "signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." *State v. McKague*, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011) (holding that a concussion was sufficient

---

[2] Under RCW 9A.04.110(6), a per se deadly weapon is "any explosive or loaded or unloaded firearm."

We note that weapons similar to a weighted club, such as a blackjack, a billy club, or a sand club, would be per se deadly weapons for purposes of a deadly weapon sentencing enhancement under RCW 9.94A.825. But RCW 9.94A.825's definition of deadly weapon does not apply here.

to allow the jury to find that the victim had suffered substantial bodily harm for second degree assault).[3]

B. DEADLY WEAPON

Baldwin argues that there was insufficient evidence to establish that the fish club was a deadly weapon because there was no evidence that it was used in a manner that could have inflicted substantial bodily harm. We disagree.

Taking the evidence in the light most favorable to the State, Baldwin struck Phillips "really hard in the head" several times with a weighted club that was 12 to 14 inches long. VRP (Nov. 6, 2018) at 35. Laumen testified that the club looked like it was capable of rendering Phillips unconscious.

The degree of force used was substantial. Laumen testified that Baldwin struck Phillips hard enough that he (Laumen) was afraid Baldwin would kill Phillips or render him unconscious. Baldwin also hit Phillips hard enough to cause a "goose egg" and to impair Phillips's movements and responsiveness for more than 20 minutes, which suggests that Baldwin used a great deal of force. VRP (Nov. 6, 2018) at 54.

---

[3] Citing *McKague*, Baldwin argues that there must be evidence that the victim suffered substantial bodily harm. But *McKague* addressed a second degree assault brought under RCW 9A.36.021(1)(a), which requires the infliction of substantial bodily harm, not RCW 9A.36.021(1)(c), which requires an assault with a deadly weapon. 172 Wn.2d at 805. Whether the defendant had in fact inflicted substantial bodily harm on the victim is a different question than whether a weapon qualified as a deadly weapon because it was readily capable of causing substantial bodily harm under circumstances in which it is used as required under RCW 9A.04.110(6). Accordingly, *McKague* is not helpful to Baldwin here apart from providing a definition of substantial bodily harm.

Baldwin also struck Phillips on a vulnerable part of his body, the head. Wells testified that he was particularly concerned about Phillips's condition because he had been repeatedly hit on the head. And although Phillips's injuries did not require hospitalization, the clubbing caused swelling and impaired Phillips's brain function for an extended period of time, which signifies a degree of harm that is considerable. Finally, Baldwin's act of repeatedly striking Phillips demonstrated Baldwin's intent and present ability to inflict substantial harm with the club.

Based on the degree of force used, the part of the body where the weapon was applied, the injuries inflicted, and Baldwin's intent and present ability to inflict harm, these facts, taken in the light most favorable to the State, would allow any rational trier of fact to find beyond a reasonable doubt that the club was readily capable of causing death or substantial bodily harm and, therefore, a deadly weapon. *Salinas*, 119 Wn.2d at 201; *Hoeldt*, 139 Wn. App. at 230; *Shilling*, 77 Wn. App. at 171; *Carlson*, 65 Wn. App. 158-59 (citing RCW 9A.04.110(6)). Accordingly, Baldwin's sufficiency argument fails.

## II. ER 609

Baldwin next argues that the trial court erred in admitting evidence of his two prior convictions for felony violation of a no-contact order as impeachment evidence under ER 609(a)(1). Although the trial court's consideration of the *Alexis* factors was inadequate, we hold that the admission of the two prior convictions was harmless.

### A. LEGAL PRINCIPLES

The trial court may admit evidence of prior convictions for the purpose of attacking a criminal defendant's credibility under ER 609. *State v. Bankston*, 99 Wn. App. 266, 268, 992 P.2d 1041 (2000). We review a trial court's ER 609 ruling for abuse of discretion. *Id.* A trial court

9

abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds. *Id.*

ER 609(a)(1) allows the trial court to admit evidence of a prior felony offense that does not involve dishonesty or false statement if "the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered." To determine whether the probative value of this evidence outweighs the potential prejudice, courts examine the six *Alexis* factors. *Alexis*, 95 Wn.2d at 19. As noted above, the factors are: "(1) the length of the defendant's criminal record; (2) remoteness of the prior conviction; (3) nature of the prior crime; (4) the age and circumstances of the defendant; (5) centrality of the credibility issue; and (6) the impeachment value of the prior crime." *Id.* The trial court must balance the *Alexis* factors on the record. *State v. Jones*, 12 Wn. App. 2d 677, 683-84, 459 P.3d 424 (2020).

We review erroneous ER 609(a) rulings under the nonconstitutional harmless error standard. *State v. Rivers*, 129 Wn.2d 697, 706, 921 P.2d 495 (1996). We will not reverse based on such an error unless we determine "that 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Id.* (quoting *State v. Ray*, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991)) (internal quotations omitted).

B. FAILURE TO CONSIDER ALL RELEVANT FACTORS

Here, the trial court determined that the *Alexis* factors weighed in favor of admitting the prior convictions. But the trial court failed to consider all six *Alexis* factors.

The trial court expressly stated that did not understand two of the factors, the length of the defendant's criminal history and the impeachment value of the prior crimes. Not only did the trial court fail to consider all of the factors, one of those factors, the impeachment value of the prior

crimes, is a key factor because the purpose of the *Alexis* factors is to allow the court to weigh the probative value of the prior crimes against the prejudicial effect. Without an understanding of the impeachment value of the prior convictions, the trial court could not weigh the probative value against any potential prejudice. Moreover, without any evidence about how the conduct underlying these convictions related to the conduct at issue in this case, we fail to see the relevance of these prior convictions.[4] *See Jones*, 12 Wn. App. 2d at 684 (prior offenses not involving crimes of dishonesty or false statement are not "'likely to be probative of a witness' veracity.'" (quoting *State v. Hardy*, 133 Wn.2d 701, 708, 946 P.2d 1175 (1997)).

Because the trial court failed to consider all of the *Alexis* factors and ultimately failed to balance the probative and prejudicial value of the prior convictions in a meaningful way, we hold that the trial court abused its discretion. Accordingly, we must address whether admission of the prior convictions was harmless. We hold that it was.

The State presented the two prior convictions to the jury as "felony violation[s] of a court order," and did not specify what that order was or mention that they were domestic violence related offenses. VRP (Nov. 6, 2018) at 84. And the jury was instructed that the prior convictions could be used only to evaluate the weight and credibility of Baldwin's testimony.

---

[4] We note that the State's argument suggests the jury needed to know that Baldwin was a convicted felon in order to evaluate his testimony. This argument is not well taken. "'Simply because a defendant has committed a crime in the past does not mean the defendant will lie when testifying.'" *State v. Hardy*, 133 Wn.2d 701, 708, 946 P.2d 1175 (1997) (quoting *State v. Jones*, 101 Wn.2d 113, 119, 677 P.2d 131 (1984), *overruled on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989), *as corrected by* 787 P.2d 906 (1990)). Unless the prior convictions were relevant to Baldwin's credibility, they would be inadmissible as propensity evidence because they were in no other way relevant to the current offense. ER 404(b).

We recognize that it is the jury's province to weigh the credibility of witnesses, but given the vague information the State presented about the prior offenses and the court's limiting instruction, considered with the strong physical evidence that the assault occurred based on Phillips's injuries, we hold that there was no reasonable probability that but for the error the outcome of the trial would have differed. *Rivers*, 129 Wn.2d at 706. The evidence that the State presented was not only strongly corroborative of Phillips's account of the assault, it also belied the claims Baldwin made in his testimony. Accordingly, although the trial court abused its discretion by admitting evidence of the prior offenses without adequately considering all of the *Alexis* factors, Baldwin is not entitled to relief on this ground.

### III. SAG

In his SAG, Baldwin contends that he acted in self-defense. SAG at 1. But at trial Baldwin testified that he did not strike Phillips, not that he acted in self-defense. RP (Nov. 6, 2018) at 73-74. And there was no other evidence suggesting that Baldwin acted in self-defense when he struck Phillips. Thus, the evidence would not support a claim of self-defense and this argument fails.

Because the evidence is sufficient to prove that the club was a deadly weapon, any error in admitting the prior offenses for impeachment purposes was harmless, and Baldwin's SAG claim has no merit, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

LEE, C.J.

GLASGOW, J.