[No. 33240-0-II.   Division Two.   August 22, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. AZEL LUKE CHAVEZ, *Appellant*.

658

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), *for appellant*.

*Deborah S. Kelly, Prosecuting Attorney*, and *Tracey L. Lassus, Deputy*, for respondent.

¶1 ARMSTRONG, J. — Azel Luke Chavez appeals his convictions for robbery, assault, unlawful possession of a firearm, taking a motor vehicle without permission, and attempted murder, arguing that he was constitutionally entitled to a jury trial, that his assault conviction violates separation of powers, that the court admitted his custodial confessions in violation of *Miranda*,[1] and that the court admitted improper hearsay evidence. We affirm, holding that Chavez had no right to a jury trial in juvenile proceedings and that the legislature did not violate the separation of powers doctrine by allowing the judiciary to define statutory terms with the common law. We also affirm the trial court's ruling that Chavez waived his *Miranda* rights; and although the trial court may have admitted hearsay evidence without a sufficient foundation, the error was harmless.

## FACTS

¶2 During spring training for the Sequim High School football team, three coaches disciplined Chavez on several occasions. Because of these incidents, Chavez quit the

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 471, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

team. He remained angry with the coaches into the fall football season. In October, he told his friend Amanda that for several months he had been planning to kill the three coaches. He explained that he would take his mother's van or his brother's truck and use his father's 12-gauge shotgun.

¶3 A few days later, Chavez told another friend, James Gambell, that he wanted to kill three people. Shortly thereafter, he donned black face paint and camouflage clothing and retrieved the shotgun, removing five shells and then reloading it with three more shells. He confronted his stepmother, Joan, pointing the gun at her and demanding the keys to the family gun safe. Joan asked, "Why are you mad at these people?" and Chavez answered, "It's the only way." Suppl. Clerk's Papers at 24. When Joan refused to give up the safe keys and Gambell blocked his access to the safe, Chavez took the family van and drove away.

¶4 Gambell and Chavez's brother, Jason, followed in another vehicle. Chavez stopped at Amanda's house and told her, "I did it" or "I'm doing it." Clerk's Papers at 25. Chavez continued driving and when he lost Gambell and Jason, he returned to Sequim High School. The football team had already left for a game in Tacoma. Although Chavez later testified that he did not believe the team would be at the high school, he had told a police officer that he went to the high school to say goodbye to a friend who was a member of the team.

¶5 In the meantime, Joan called 911 and reported Chavez's behavior. Chavez fled Sequim and led police officers on a high speed chase from Clallam County through Jefferson County and into Kitsap County, where the pursuit ended when he collided head-on with a police car on the Hood Canal Bridge. Officers disarmed him and placed him under arrest. While in custody, Chavez gave statements to three different law enforcement officers. Before each statement, the officers advised him of his *Miranda* rights.

¶6 The State charged Chavez with first degree robbery, second degree assault, second degree unlawful possession of a firearm, second degree taking a motor vehicle without permission, and three counts of attempted murder in the first degree. He was tried in juvenile proceedings without a jury. Before trial, the State moved to disqualify one of Chavez's attorneys due to a conflict of interest. During the discussions, the trial judge mentioned that Chavez, at 14, would not be able to execute a valid waiver of the conflict. The trial court also held a CrR 3.5 hearing and ruled that Chavez had voluntarily, knowingly, and intelligently waived his *Miranda* rights.

¶7 During Joan's testimony, the State sought to play the recording of her 911 call, under the recorded recollection exception to the hearsay rule. While laying the foundation for this admission, the following exchange occurred between the prosecutor and the witness:

Q   Do you remember telling the 911 operator what Azel said?

A   I remember—I don't remember telling him what he said. . . .

Q   Is it fair to say, you just said you don't remember what you told the 911 operator in terms of what Azel said?

A   Yeah, I remember what I said.

Q   And, is it also fair to say that today you don't have a complete recollection of every word that Azel used that day?

A   No.

Q   And, is it true that when you were telling the 911 operator what had happened, you were trying to give her a full and complete picture what had happened?

A   Yeah, I was trying to let them know.

Report of Proceedings (Mar. 7, 2005) at 64.[2] Over defense counsel's objection, the recording was admitted as a recorded recollection.

---

[2] Because the various volumes of the record are not numbered consecutively, references to the record in this opinion identify the volume by date of the proceeding.

¶8 The trial judge found Chavez guilty on all seven counts. At sentencing, defense counsel argued for a reduced disposition but the trial judge found that none of the statutory mitigating factors existed. The judge imposed the standard range disposition of 309 to 387 weeks, plus a 12-month firearm enhancement. In deciding on the standard disposition, the judge relied on the opinions of two psychological professionals as to what would be most conducive to Chavez's rehabilitation.

## ANALYSIS

### I. RIGHT TO JURY TRIAL IN JUVENILE PROCEEDINGS

¶9 Washington's Juvenile Justice Act of 1977, chapter 13.40 RCW, requires cases in juvenile court to be tried without a jury. See RCW 13.04.021(2). Under the Washington Constitution, the right of jury trial "shall remain inviolate." WASH. CONST. art. I, § 21. In criminal prosecutions, the accused has the right to "a speedy public trial by an impartial jury." WASH. CONST. art. I, § 22. The United States Constitution guarantees a criminal defendant "the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI. The courts have held that the Juvenile Justice Act does not violate these constitutional provisions because the juvenile justice system is rehabilitative rather than retributive. See State v. Schaaf, 109 Wn.2d 1, 16, 743 P.2d 240 (1987); McKeiver v. Pennsylvania, 403 U.S. 528, 547, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971).

¶10 Nonetheless, Chavez argues that his right to a jury trial was violated. First, he asserts that two recent United States Supreme Court opinions support the right to a jury trial in juvenile proceedings under the United States Constitution. Second, he contends that the right to trial by jury enjoys greater protection under the Washington Constitution and that recent changes to the juvenile justice system change the analysis of the juvenile jury trial right in this state. Finally, he argues that the right to trial by jury should be examined in the individual case and that the lack

of rehabilitative options available under his particular conviction should trigger the right to a jury trial. These arguments are contrary to precedent.

1. *The Federal Constitution*

■ ¶11 Chavez's first argument relies on the recent United States Supreme Court decisions of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), to establish a broader right to a jury trial in criminal proceedings. In *Crawford*, considering whether admitting hearsay against a criminal defendant violated the confrontation clause, the Court analyzed the clause within its historical context and concluded that it prohibits the admission of hearsay unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54. In *Blakely*, considering whether the right of a jury trial extended to sentence-enhancing factors in criminal proceedings, the Court again analyzed the right's history and concluded that it did apply to the aggravating factors. *Blakely*, 542 U.S. at 308. Applying this historical analysis to the juvenile jury trial right, Chavez reasons that because the law drew no distinction between the jury trial rights of juveniles and adults when the Sixth Amendment was enacted, a juvenile is entitled to a jury trial.

¶12 The argument that *Blakely* mandates a right of jury trial for juveniles has been foreclosed by our holding in *State v. Meade*, 129 Wn. App. 918, 120 P.3d 975 (2005). There, we held that the Court in *Blakely* "showed no intention . . . to overrule its well-established holding that the right to a jury does not attach to the traditional juvenile justice system." *Meade*, 129 Wn. App. at 925-26 (citing *McKeiver*, 403 U.S. at 543).

¶13 To be sure, *Blakely* and *Crawford* demonstrate the United States Supreme Court's emphasis on historical context in interpreting the Constitution. But the historical fact that no distinction existed between juveniles and

adults regarding the right to a jury trial when the Sixth Amendment was enacted is unpersuasive. When the Bill of Rights was promulgated, no juvenile justice system existed. *See* Mary M. Prescott, Note, *Another Option for Older, Nonviolent Juveniles: Statutory Retention of Juvenile Court Jurisdiction Past the Age of Majority*, 85 Iowa L. Rev. 997, 1010 (2000) (noting that the juvenile justice system originated in 1899). Because children were subject to the same criminal justice system as adults, it was natural for them to have the same right to a jury trial. This does not alter the United States Supreme Court's holding that a jury trial is not constitutionally required in a separate proceeding designed to rehabilitate minors. *See McKeiver*, 403 U.S. at 547; *see also Schaaf*, 109 Wn.2d at 14 ("It does no violence to our state's common law history to give credence to a 70-year-old legal system that was nonexistent in our territorial days.").

## 2. *The Washington Constitution*

█ ¶14 Chavez's *Gunwall*[3] analysis to establish that the Washington Constitution affords a broader jury trial right than the United States Constitution is not persuasive; the Washington Supreme Court has long held that the state constitution does not require a jury trial for juvenile offenders. *See Schaaf*, 109 Wn.2d at 16. But Chavez argues that the courts have tolerated denying jury trials for juveniles only because of the juvenile system's rehabilitative focus. He reasons that juveniles must be afforded jury trials once juvenile proceedings become " 'akin to an adult criminal prosecution.' " Br. of Appellant at 14 (quoting *State v. Lawley*, 91 Wn.2d 654, 656, 591 P.2d 772 (1979)). Chavez then lists a series of changes to the juvenile justice system "over the last decade," which, according to Chavez, have rendered the system more penal and more akin to the adult system. *See* Br. of Appellant at 14-19.

¶15 Again, this argument is foreclosed by our holding in *Meade*. There we held that, despite numerous recent amend-

---

[3] *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

ments to the Juvenile Justice Act, the system "remains focused on rehabilitation." *Meade*, 129 Wn. App. at 925 (citing *State v. Watson*, 146 Wn.2d 947, 952-53, 51 P.3d 66 (2002)); *see also In re Dependency of A.K.*, 130 Wn. App. 862, 884-85, 125 P.3d 220 (2005); *State v. Tai N.*, 127 Wn. App. 733, 739-40, 113 P.3d 19 (2005), *review denied*, 156 Wn.2d 1019 (2006).

### 3. *Juveniles Charged with Serious Offenses*

■ ¶16 Finally, Chavez claims that even if the bench trial requirement is constitutional in its general application, as applied to him it is not. Because the serious charges against him disqualified him from "all of the special rehabilitative programs available to other juveniles," he argues that his trial was akin to an adult criminal proceeding and therefore required a trial by jury. Br. of Appellant at 22.

¶17 The State counters that regardless of the alternative dispositions for which Chavez is not eligible, he still qualifies for rehabilitation programs during his incarceration. In particular, the State notes that Chavez is being held at a juvenile rehabilitation administration agency, which offers an array of rehabilitative services, and that the sentencing guidelines in the juvenile system are intended to respond to the needs of youthful offenders.

¶18 In imposing Chavez's disposition, the trial judge gave great weight to two psychological evaluators' reports that recommended the best situation for Chavez's rehabilitation and emotional growth. And defense expert Dr. Trowbridge endorsed the psychotherapy available in juvenile institutions as being more suited to Chavez's individual needs than the services available in adult prisons. Because this sentencing approach shows that the State was processing Chavez in a justice system more focused on rehabilitation than the adult criminal system would have been, we find Chavez's "as applied to him" argument unpersuasive.

## II. SEPARATION OF POWERS

¶19 Chavez asks that we dismiss his assault conviction with prejudice. Count II charged Chavez with second degree assault. The relevant statute states that a defendant is guilty of assault if he "[a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c). Because the statute does not define "assault," the courts have supplied the common law definition. *See State v. Frazier*, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972); *State v. Rush*, 14 Wn.2d 138, 139-40, 127 P.2d 411 (1942); *State v. Shaffer*, 120 Wash. 345, 348-50, 207 P. 229 (1922). Chavez argues that this judicial definition of an essential element of a crime violates the separation of powers.

¶20 A party challenging the constitutionality of a statute bears the burden of proving that the statute is unconstitutional beyond a reasonable doubt. *State ex rel. Peninsula Neighborhood Ass'n v. Dep't of Transp.*, 142 Wn.2d 328, 335, 12 P.3d 134 (2000). While the Washington Constitution contains no express separation of powers clause, the doctrine has been presumed throughout the state's history by the division of government into three separate branches. *Carrick v. Locke*, 125 Wn.2d 129, 134-35, 882 P.2d 173 (1994). The principle is violated when " 'the activity of one branch threatens the independence or integrity or invades the prerogatives of another.' " *State v. Moreno*, 147 Wn.2d 500, 505-06, 58 P.3d 265 (2002) (quoting *Carrick*, 125 Wn.2d at 135). But the doctrine does not require that the various branches be "hermetically sealed off from one another." *Carrick*, 125 Wn.2d at 135. They "must remain partially intertwined if for no other reason than to maintain an effective system of checks and balances, as well as an effective government." *Carrick*, 125 Wn.2d at 135 (citing *In re Salary of Juvenile Dir.*, 87 Wn.2d 232, 239-40, 552 P.2d 163 (1976)). Because the doctrine protects institutional rather than individual interests, a history of cooperation within the institution in a given instance militates against a finding of a separation of powers violation. *Carrick*, 125 Wn.2d at 136.

■ ¶21 Chavez's claim raises two potential separation of powers violations. First, the courts may violate the doctrine if they encroach on legislative functions. *See State v. Wadsworth*, 139 Wn.2d 724, 734, 991 P.2d 80 (2000). Second, a statute may be unconstitutional if the legislature delegates to the judiciary a function that is reserved exclusively to the legislature by the constitution. *Sackett v. Santilli*, 146 Wn.2d 498, 504, 47 P.3d 948 (2002). Chavez's arguments fail to demonstrate either violation.

■ ¶22 Although the legislature's function is to define the elements of a crime, the "[l]egislature has an established practice of defining prohibited acts in general terms, leaving to the judicial and executive branches the task of establishing specifics." *Wadsworth*, 139 Wn.2d at 743. For example, the bail-jumping statute criminalizes the failure to appear before a court, RCW 9A.76.170, but the courts determine the dates on which the defendant must appear. *Wadsworth*, 139 Wn.2d at 736-37. In protection-order legislation, the legislature specifies when the orders may be issued and the criminal intent necessary for a violation but the courts determine the specific prohibitions. *Wadsworth*, 139 Wn.2d at 737. The legislature has broadly defined the elements of criminal contempt as intentional disobedience to a judgment, decree, order, or process of the court, but the courts declare the specific acts of disobedience. *Wadsworth*, 139 Wn.2d at 737. The legislature's history of delegating to the judiciary how statutes will be specifically applied demonstrates that the practice does not offend the separation of powers doctrine. *See Carrick*, 125 Wn.2d at 136.

■ ¶23 Moreover, the legislature has instructed that the common law must supplement all penal statutes. RCW 9A.04.060. This statute performs two relevant functions. It ratifies the judicial practice of supplying common law definitions to statutes. And it affirmatively defines the elements of criminal statutes as containing common law definitions. *See State v. Smith*, 72 Wn. App. 237, 241, 864 P.2d 406 (1993). Accordingly, the legislature has not delegated to the judiciary the task of defining "assault" but

rather has instructed the judiciary to define assault according to the common law.

¶24 Finally, the legislature has acquiesced to the courts' common law definition of assault, both by not changing the definition and by enacting RCW 9A.04.060. The legislature removed the statutory definition of assault from the criminal code in 1909. When the legislature enacted RCW 9A.04.060 in 1975, *Smith*, 72 Wn. App. at 241, we presume it was aware of the common assault definitions the courts had been using for the preceding half century. *See State v. Carlson*, 65 Wn. App. 153, 157-58, 828 P.2d 30 (1992).[4] Had the legislature believed its institutional integrity was being threatened by the courts' definition, it could have inserted its own definition into the statute. Instead, it enacted a general provision endorsing the courts' historical use of the common law to define assault.

¶25 In summary, consistent with their history, the legislative and judicial branches have cooperated in defining the offense of assault. Chavez has presented no authority to show that this established practice is unconstitutional beyond a reasonable doubt. We affirm Chavez's second degree assault conviction.

¶26 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

VAN DEREN, A.C.J., and HUNT, J., concur.

Review granted at 160 Wn.2d 1021 (2007).

---

[4] Although Chavez claims that the courts enlarged the definition of assault in 1978, the expansion is "actual battery," added to the previously noted definitions of "attempt to commit a battery" and "placing another in apprehension of harm." Br. of Appellant at 27 (citing *State v. Strand*, 20 Wn. App. 768, 780, 582 P.2d 874 (1978); *State v. Garcia*, 20 Wn. App. 401, 403, 579 P.2d 1034 (1978)). The cited cases indicate that this was an interpretation of the common law already being applied rather than an expansion of that law. In any event, the legislature has arguably acquiesced to this definition as well, by leaving the law unchanged for 28 years.