IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>v.<br><br>CHRISTOPHER MICHAEL FIELDS,<br><br>                Appellant. | No. 84811-9-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — Christopher Fields was convicted by a jury of two counts of rape in the second degree after his wife, R.F., alleged that he raped her while she was asleep and unable to consent. Fields challenges the introduction of testimony from a licensed marriage and family therapist who conducted joint couples counseling sessions with Fields and R.F., arguing that it was introduced in violation of statutory privilege under RCW 5.60.060(9). Fields also contends that the State's introduction of an audio recording of a conversation between himself and R.F. violates Washington's privacy act. We agree, reverse and remand for a new trial.

FACTS

Fields and R.F. began dating in 2009. The two had an on and off relationship until R.F. became pregnant with the couple's daughter in 2010. The pair did not have a "strong relationship" throughout R.F.'s pregnancy. The pair married in 2013 and lived together in R.F.'s home in Auburn.

Following the birth of their daughter in 2011, R.F. reports that Fields began to sexually assault her while she slept. R.F. testified at trial that she would wake up in the morning and find semen in her vagina when she and Fields had not had consensual sex. R.F. woke up to find Fields' hand in her underwear and his fingers in her vagina on multiple occasions. In early 2016, R.F. was sleeping in the couple's bed and woke to find Fields having sexual intercourse with her. R.F. shoved Fields off of her and started yelling that Fields had raped her. In another incident around May 2016, R.F. woke up to Fields' fingers inserted into her vagina. R.F. testified that she had not given Fields permission to touch her while she slept.

In August, R.F. and Fields sought marriage counseling in an effort to improve their relationship by establishing boundaries and working on their communication. The two initially saw two different counselors, with R.F. seeing licensed marriage and family therapist, Nicolette Stenger, and Fields seeing a different male counselor. R.F. reported the sexual assaults to Stenger in individual sessions. In September 2016, the couple began to see Stenger together and participated in joint marriage counseling sessions. The two worked on setting boundaries in their counseling sessions.

In November and December 2016, while undergoing joint counseling, R.F. again awoke to find Fields' fingers inserted in her vagina on multiple occasions. R.F. testified that she worked with the counselor individually to "set a boundary" with Fields regarding his touching her while she slept because "[she] was not good at setting boundaries and maintaining [her] boundaries." In January 2017, R.F. and Fields discussed the matter in a joint counseling session. Fields and R.F. did not attend any further joint counseling sessions after January 6.

R.F. reported the assaults to Auburn police in May 2017. Fields was subsequently charged with two counts of rape in the second degree and proceeded to a jury trial.

Trial

In a motion in limine, Fields argued that the detective who took R.F.'s report at the police station should not be permitted to testify that R.F. had reported a "sexual assault" because it was inadmissible hearsay. The State agreed and the trial court granted the motion in limine. The detective testified that R.F. arrived in person to the police station with another person and that "they were there to report a sexual assault." Fields did not object.

Prior to trial, the State moved to admit two audio recordings of conversations between Fields and R.F. that R.F. had recorded on her cell phone. Fields moved to exclude one of the recordings under the Washington privacy act, chapter 9.73 RCW. Fields argued that the recording was made without his knowledge and permission and did not fit into any exceptions permitting it under the privacy act. The State argued that because Fields indicated his desire not to be recorded and expressed his worry that R.F. would attempt to blackmail him if the conversation was recorded, Fields was aware that he was being recorded and the privacy act did not prohibit the admission of the recording. After an evidentiary hearing in which R.F. testified to the circumstances of the recording, the court ruled

> [Fields'] concern about being recorded, his willingness to say other things when he's not recorded, all demonstrate conclusively, in my view, that that part of the conversation was no longer private because he knew that it would be – or could be disclosed to third parties, and it was going to be therefore a public conversation.

3

So because it was not private, the consent does not need to be announced under RCW 9.73.030(3). In fact, 9.73.030 doesn't apply at all because that only applies to private conversations. And from that moment on, it was not a private conversation, so the statute doesn't apply.

The recording was admitted at trial, played multiple times, and discussed throughout the State's opening and closing arguments.

The defense also opposed the State's pretrial motion to introduce testimony from Stenger, Fields' and R.F.'s licensed marriage and family therapist. The State argued that Fields' and R.F.'s sessions with Stenger were not privileged under RCW 5.60.060(9) and that Fields had consented to use the records in a prior family law case, waiving any privilege. The defense argued that Fields had not waived the privilege and that the privilege prevented Stenger from testifying at trial. In response, the State argued that because the defense had requested and subpoenaed Stenger for records regarding R.F.'s treatment, Fields had waived the privilege. The State presented no evidence that Fields had done so. Defense counsel requested and was granted a brief recess to speak to his client. After going back on the record, defense counsel conceded that the statements were not privileged, stating

> I didn't represent him in the family law case. And as I'm starting to think about this concept, as you drew out, I mean, the fact that we're holding these in our hand means somehow, they were produced. So if they're out in the public sphere, and I just – I'm not going to get into privilege, but let's just assume that I have knowledge that those were out in the public sphere in the family law court proceeding. That's point one.
> And point two, Ms. – this is a joint privilege with [R.F.], and I think there is case law, I don't know if the prosecution cited it, that if they're joint records and one of the spouses wants to put it in, it comes in.
> So in any event, I think the fact that those exist waives the privilege.

At trial, Stenger testified that R.F. disclosed the sexual assaults in an individual counseling session. Stenger testified that in a January 6, 2017 joint counseling session,

R.F. stated "I want to talk about the rape." Stenger testified that she had a "vague memory of [Fields] saying that he didn't see it the same way [R.F.] did" and that though the couple agreed on the events that occurred, Fields did not see it as an assault. Stenger stated that Fields "agreed that he had started to have sex with [R.F.] while she was asleep." Stenger read from her summary of the session that Fields had stated "If we had sex more often, if that need was being met, maybe I wouldn't wake up in the middle of the night having sex with you." Stenger had no independent recollection of the conversation and her recollection was refreshed using summaries of the joint sessions that she had written following the sessions. In addition to Stenger's testimony, her summaries of the joint counseling sessions, including statements made by both Fields and R.F., were admitted into evidence.

At trial, R.F. testified that she was a "pretty heavy sleeper" and would "sleep like a log." R.F. stated that she would, however, wake up to the sounds of her children opening the bedroom door and the sounds of the family's pet pig "walking across the wood floor." R.F. testified that being able to wake to those sounds may be "a mother thing" because she was able to sleep through other sounds, such as "neighbors, chain sawing, or having tractors, or somebody getting up and getting ready for work, or the dogs having to go out and go potty." R.F. testified that in the last two years of their marriage, she began drinking at the end of the day to cope with the stress of her life and relationship with Fields. R.F. stated that it began with having "a glass of wine," and eventually became "two glasses of wine," then "three glasses of wine," before "wine wasn't enough" and she began drinking "White Russian" cocktails in the last year of the

marriage. R.F. stated that the alcohol never caused her to be "in a blackout state" and that she "never drank to the extremity of not remembering."

R.F. testified that she knew Fields was assaulting her in her sleep because she "would wake up to having his hand down [her] underwear with his fingers in [her] vagina" while Fields masturbated, causing the whole bed to shake.

Fields testified that he was also asleep at the time of at least one of the alleged assaults and woke to find himself kissing R.F. Fields stated that based on the way R.F. was responding to his advances, he believed she was awake and consenting to sex, so he began to have sex with her. Fields also explained that his statements in the counseling session were not an admission to the assaults alleged by R.F., but were instead an attempt to follow the principles he learned in those therapy sessions. Fields explained that Stenger encouraged Fields and R.F. to use the "Gottman principles," which require participants to avoid being defensive and to address the feelings behind what their partner is saying. R.F. explained that in the January 6 joint counseling session, he did not intend his statement to be an admission of guilt, but was instead an attempt to understand and reflect R.F.'s feelings.

Fields was convicted on both counts and sentenced to an indeterminate sentence of 120 months to life confinement on each count.

Fields appeals.

DISCUSSION

Privilege

Fields challenges the admission of testimony from the licensed marriage and family therapist who presided over joint counseling sessions between Fields and R.F.

6

Fields argues that his statements in the counseling session were privileged under RCW 5.60.060(9)[1] and that his trial counsel was ineffective for agreeing with the State that the privilege did not apply.  In order to address Fields' claims of ineffective assistance of counsel, we must first determine whether his statements in joint marriage counseling sessions were privileged under RCW 5.60.060(9).

*A. RCW 5.60.060(9)*

The State argues that because both Fields and R.F. were present for the marriage counseling sessions, any privilege was waived by the presence of a third party, R.F.  The State also asserts that because Fields had subpoenaed these records for a separate proceeding in family court, he had waived the privilege, allowing the testimony to be introduced at trial.

"There are two types of privileges: common law privileges and statutory privileges."  Magney v. Truc Pham, 195 Wn.2d 795, 802, 466 P.3d 1077 (2020).  Courts have greater latitude to interpret common law privileges, whose codifications are "merely declaratory of the common law."  Magney, 195 Wn.2d at 802 (quoting State v. Emmanuel, 42 Wn.2d 799, 815, 259 P.2d 845 (1953)).  Where a privilege is created by statute and not found under the common law, however, it is considered to be an exemption from the common law and must be strictly construed.  Id. at 802 (citing Petersen v. State, 100 Wn.2d 421, 429, 671 P.2d 230 (1983)); Carson v. Fine, 123 Wn.2d 206, 212-13, 867 P.2d 610 (1994).  The Washington Supreme Court has held that the statutory privilege afforded for marriage counseling must be strictly construed

---

[1] Fields actually cites to RCW 5.60.050(9), which does not exist.  It is apparent that the cite to RCW 5.60.050(9) was a scrivener's error.

7

by interpreting the specific words in the statute that the legislature has codified. Magney, 195 Wn.2d at 802-03 (citing Petersen, 100 Wn.2d at 429).

We review issues of statutory interpretation de novo. State v. Dennis, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). "When construing a statute, our goal is to determine and effectuate legislative intent." Magney, 195 Wn.2d at 803 (citing Swinomish Indian Tribal Cmty. V. Dep't of Ecology, 178 Wn.2d 571, 581, 311 P.3d 6 (2013)). "We begin with the statute's plain language. 'If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction.'" In re Det. of C.A.S., 25 Wn. App. 2d 21, 26, 522 P.3d 75 (2022) (quoting HomeStreet, Inc. v. State, Dep't of Revenue, 166 Wn.2d 444, 210 P.3d 297 (2009).

We discern the meaning of a statutory provision "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." In re Det. of Anderson, 185 Wn.2d 79, 87, 368 P.3d 162 (2016). "It is settled that the plain meaning of a statute is determined by looking not only 'to the text of the statutory provision in question,' but also to 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" State v. Hurst, 173 Wn.2d 597, 604, 269 P.3d 1023 (2012) (citing State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010)). "If, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." Magney, 195 Wn.2d at 803 (citing Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

When interpreting a statute, we must also keep in mind the canon *expressio unius est exclusive alterius*, "where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature." Id. at 803 (citing Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 77 Wn.2d 94, 98, 459 P.2d 633 (1969)).

RCW 5.60.060 codifies 10 privileges. Some of those included in the statute are codifications of common law privileges, such as the attorney-client privilege, while others are purely statutory. Magney, 195 Wn.2d at 806. Among these privileges is RCW 5.60.060(9), which provides

(9) A mental health counselor, independent clinical social worker, or marriage and family therapist licensed under chapter 18.225 RCW may not disclose, or be compelled to testify about, any information acquired from persons consulting the individual in a professional capacity when the information was necessary to enable the individual to render professional services to those persons except:

(a) With the written authorization of that person or, in the case of death or disability, the person's personal representative;

(b) If the person waives the privilege by bringing charges against the mental health counselor licensed under chapter 18.225 RCW;

(c) In response to a subpoena from the secretary of health. The secretary may subpoena only records related to a complaint or report under RCW 18.130.050;

(d) As required under chapter 26.44 or 74.34 RCW or RCW 71.05.217(6) or (7); or

(e) To any individual if the . . . marriage and family therapist licensed under chapter 18.225 RCW reasonably believes that disclosure will avoid or minimize an imminent danger to the health or safety of the individual or any other individual; however, there is no obligation on the part of the provider to so disclose.

R.F. testified that the couple initially started seeing separate counselors, but later began joint-counseling sessions together with Stenger. Stenger was a licensed marriage and family therapist in Washington State. While Stenger initially saw only R.F. for individual counseling, she began treating both R.F. and Fields in joint counseling sessions in September 2016 in her capacity as a licensed marriage and family therapist. Additionally, during pretrial hearing on motions in limine, the State also explained that Stenger had provided "therapy of counseling services in a joint capacity when [R.F.] and [the defendant] went to see her over several sessions." In arguing that the privilege did not apply, the prosecutor said "[t]he State acknowledges that Mr. Fields was a patient. The State acknowledges that this discussion was part of care that Ms. Stenger was attempting to provide to both [Fields] and to [R.F.] at the time."

The State argues that because R.F. was present in the marriage counseling sessions with Fields, any privilege was waived because R.F. was a third party to those sessions. Generally, confidentiality is necessary to establish a testimonial privilege. State v. Martin, 137 Wn.2d 774, 787, 975 P.2d 1020 (1999). In some instances, the mere presence of a third person may vitiate a privilege. Id. Privileges are not vitiated, however, where that third person is necessary for the communication to occur. Id. Where the third party is present as a "'needed and customary participant'" in a treatment, courts have held that their presence does not waive the privilege in other contexts. State v. Salas, 1 Wn. App. 2d 931, 950, 408 P.3d 383 (2018) (citing State v. Gibson, 3 Wn. App. 596, 599, 476 P.2d 727 (1970) (holding that the presence of a police officer during an arrestee's medical treatment did not vitiate the privilege because the officer was necessary for the protection of both the physician and patient)).

10

The State posits that R.F.'s presence was not "strictly necessary" for counseling to "improve the marriage." However, the legislature did not limit this privilege only to counselors treating individuals, but specifically provided privilege for a licensed "marriage and family therapist." RCW 5.60.060(9). Additionally, chapter 18.225 RCW, governing the licensure of marriage and family therapists and referenced in RCW 5.60.060(9), defines "marriage and family therapy" as

> [T]he diagnosis and treatment of mental and emotional disorders, whether cognitive, affective, or behavioral, within the context of relationships, including marriage and family systems. Marriage and family therapy involves the professional application of psychotherapeutic and family systems theories and techniques in the delivery of services to individuals, couples, and families for the purpose of treating such diagnosed nervous and mental disorders. The practice of marriage and family therapy means the rendering of professional marriage and family therapy services to individuals, couples, and families, singly or in groups, whether such services are offered directly to the general public or through organizations, either public or private, for a fee, monetary or otherwise.

RCW 18.225.010(8).

Both the definition of marriage and family therapist, as well as the legislature's specific inclusion of marriage and family therapists in the statute governing privilege, evidence an intent that the privilege encompass those seeking marriage and family therapy specifically, which often include couples and families. The legislature added no provision limiting the privilege only to individuals and no provision waiving or vitiating the privilege by the presence of both parties in the marriage.

The State relies on State v. Anderson to support its argument that the privilege is waived when more than one individual is present in a counseling session. 44 Wn. App. 644, 723 P.2d 464 (1986). In Anderson, the court held that statements made by the defendant and his wife in a "family therapy" session were not protected by the physician-patient privilege because of the presence of the couple's son where "the

11

record [did] not disclose the necessity of the son's presence." 44 Wn. App. at 650. This case, however, is inapposite. At issue in Anderson, was not the "therapist-patient" privilege or marriage and family therapist-patient privilege, but the physician-patient privilege, as outlined in a separate provision of the statute governing privilege. Licensed marriage and family therapists were not included in the statute until 2009, more than 20 years after Anderson was published. Compare former RCW 5.60.060 (1986), with LAWS OF 2009, Ch. 424, § 1.

The State also asserts that because Fields had subpoenaed these records for a separate proceeding in family court, he had waived the privilege, allowing the testimony to be introduced at trial. The State presented to the trial court a three-page summary of several joint therapy sessions that was apparently created by Stenger after looking at her clinical notes. The State claimed that this summary was produced "on request of both [R.F.] and also Mr. Fields back in 2018, for a family court matter." The State also stated to the court that "versions of this were produced by [R.F.]" to the investigating detective in this criminal case. Fields' counsel maintained that Fields had not waived his privilege.

The State presented no evidence beyond its own assertions before the trial court that Fields consented to releasing the challenged records to the family law court. Although the exhibit introduced at trial includes a fax cover memorandum,[2] it does not indicate who requested the records, nor whether they were produced at the behest of a subpoena. It is similarly unclear whether these records were produced for the instant

---

[2] The top line of the cover memorandum says that it was sent to Canfield Madow Law's fax number, but there is nothing in the record indicating who they represent. The memo does not state who requested the information nor who it was specifically addressed to.

12

case or for a family law proceeding. The party seeking to admit evidence bears the burden of establishing its admissibility. See State v. Giles, 196 Wn. App. 745, 757, 385 P.3d 204 (2016).

We conclude that under RCW 5.60.060(9), the joint-counseling sessions with licensed marriage and family therapist, Stenger, were subject to privilege.

*B. Ineffective Assistance of Counsel*

Fields contends that his counsel was ineffective for agreeing that the testimony was not privileged or was not waived.

After the State argued that Fields had waived his privilege by requesting the challenged records by subpoena in his family law case, counsel for Fields ask to confer with his client. After which, counsel told the court,

> So I didn't represent him in the family law case. And as I'm starting to think about this concept, as you drew out, I mean, the fact that we're holding these in our hand means somehow, they were produced. So if they're out in the public sphere, and I just – I'm not going to get into privilege, but let's just assume that I have knowledge that those were out in the public sphere in the family law court proceeding. That's point one.
> And point two, Ms. – this is a joint privilege with Ms. Fredricks, and I think there is case law, I don't know if the prosecution cited it, that if they're joint records and one of the spouses wants to put it in, it comes in.

Ineffective assistance of counsel is a constitutional error arising from the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing State v. Nichols, 16 Wn.2d 1, 9, 162 P.3d 1122 (2007)).

13

To establish ineffective assistance of counsel, a defendant must establish that his attorney's performance was deficient and that the deficiency prejudiced the defendant. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Deficient performance is a performance that falls "below an objective standard of reasonableness based on consideration of all the circumstances." Id. (citing State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). To show prejudice, the defendant must prove that there is a reasonable probability that, but for the counsel's deficient performance, the outcome of the proceedings would have been different. Id. (citing State v. Leavitt, 111 Wn.2d 66, 72, 758 P.2d 982 (1988)).

There is a strong presumption that counsel's performance was reasonable. Id. (citing State v. Studd, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999)). A defendant can rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). The defendant must show that there was no legitimate strategic or tactical reason for the counsel's actions. Salas, 1 Wn. App. 2d at 949-50 (citing McFarland, 127 Wn.2d at 335). "Reasonable conduct for an attorney includes carrying out the duty to research the relevant law." Kyllo, 166 Wn.2d at 862 (citing Strickland, 466 U.S. at 690-91).

In Salas, a defendant received medical treatment after arrest, during which the arresting officer remained in the room while Salas discussed his injury and treatment with a doctor and nurse. 1 Wn. App. 2d 931, 948, 408 P.3d 383 (2018). The officer was permitted to testify at trial, without objection from defense counsel, that when the doctor asked if Salas had been assaulted, "Salas 'chuckled and he said – he said, no, I

14

killed somebody.'" Id. Salas subsequently argued that his counsel was ineffective for failing to challenge the admission of the officer's testimony because it was a privileged statement to medical personnel. Id. at 949. This court ruled that the statements made to medical personnel in front of the officer were privileged under the physician-patient privilege in RCW 5.60.060(4) and that "there is no apparent strategic or tactical reason why counsel would decide against asserting Salas' right to patient confidentiality as a basis for suppression of his statements" where defense counsel should have found and cited case law on point on the issue. Id. at 951.

The instant case presents a similar circumstance. Fields' defense counsel agreed, despite the fact the trial court was only presented with the State's argument sans any supporting evidence, that Fields had waived his privilege because "somehow" the privileged information was in the "public sphere."

As discussed above, the plain language of RCW 5.60.060(9) protects statements made to licensed marriage and family therapists as privileged in a joint-counseling session. No case has held that one spouse can waive the privilege that the other spouse may have in communications with their counselor during a joint-counseling session. In other applications, courts have concluded that where no case law indicates an error, conduct by defense counsel that is later found to be contrary is not deficient performance. See State v. Studd, 137 Wn.2d 533, 973 P.2d 1049 (1999) (holding that it was not deficient performance for defense counsel to request a jury instruction later held to misstate the law). An attorney's failure to anticipate a change in the law does not constitute ineffective assistance of counsel. See In re Pers. Restraint of Benn, 134 Wn.2d 868, 939, 952 P.2d 116 (1998). However, a plain reading of the statute is not a

*change* in the law. More importantly, despite the State's argument before the trial court, there was no evidence presented that Fields had previously waived his privileged communication from the joint-counseling sessions. Because there was no change in the law, Fields' attorney failed to conduct additional research, and the State failed to meet its burden by providing evidence of the claims it asserted in argument, we conclude that defense counsel's performance was deficient.

The State argues that Fields' defense counsel conceded to the admission of Stenger's testimony as a means to "present valuable impeachment evidence in support of his theory that R.F. accused Fields of rape to 'humiliate [him] in the legal system.'" The State asserts that this was a legitimate trial strategy preventing this court from holding that counsel's performance was deficient.

Following the admission of Stenger's testimony, Fields' defense counsel explained that because the testimony would be admitted he wished to admit Stenger's summaries of the joint counseling sessions showing that R.F. did not raise claims of the alleged rapes until a session on January 6, 2017, despite the fact that the couple attended joint sessions throughout the period between October and December 2016 in which R.F. claims she was raped repeatedly by Fields while she slept. Defense counsel argued that R.F.'s failure to bring up the issue in earlier sessions was impeachment by omission evidence undermining R.F.'s credibility. However, Stenger's testimony and summaries provide the only potentially corroborating evidence supporting R.F.'s claim that Fields admitted to raping R.F. while she slept. Stenger testified that Fields stated in the joint counseling session that he agreed that he had begun to have sex with R.F. while she slept.

We are not persuaded that agreeing to the admission of the only incriminating statement his client made through an independent third party was a legitimate strategic and tactical way defense counsel could introduce some impeaching evidence against the accuser. Defense counsel's after-the-fact argument to admit more records was an attempt to salvage what he mistakenly thought was a lost cause in trying to keep Field's statements in the joint-counseling sessions excluded. Even without Stenger's testimony, defense counsel could have emphasized R.F.'s delay in reporting. She asserted the rapes occurred in November and December 2016, but did not report them to police until May 2017. We conclude that defense counsel's performance was deficient.

We must next determine whether Fields was prejudiced by his counsel's deficient performance.

Without Stenger's testimony, the jury would have been left with what was essentially a "he said, she said" case hinging entirely upon their weighing of R.F.'s and Fields' credibility, as both testified at trial. R.F. testified that she was both a heavy sleeper and also would wake up at the sound of her pet pig walking across the wood floor. Stenger's testimony introduced independent corroborating evidence that Fields had admitted to having sex with R.F. while she slept. This admission conflicts with Fields testimony that he had never had sex with R.F. while she slept and that during the alleged rapes he believed she was awake and able to consent based on the way she responded to his sexual advances.

We conclude that there is a reasonable probability that, but for the counsel's deficient performance, the outcome of the proceedings would have been different. Thus, we conclude that Fields has established that his counsel was ineffective.

## Privacy Act

Fields next argues that the admission of an audio recording of his conversation with his wife was admitted in violation of Washington's privacy act, RCW 9.73.030. We agree. The court conducted an evidentiary hearing to determine the admissibility of the recorded conversation captured by R.F. on her cell phone. The recording was played and R.F. testified to the circumstances surrounding the recording. The recording begins in the middle of a conversation between Fields and R.F.

> R.F.:  . . . you can't even say what it is. What are you asking forgiveness for?
>
> Fields: I'm not . . . feel blackmailed.
>
> R.F.: This isn't blackmail.
>
> Fields: You don't have my permission to record me.
>
> R.F.: Oh, you really think that I'm going to use it for blackmail, for real?
>
> Fields: No, I'm just saying…you don't have my permission to record me.

R.F. takes issue with Fields not taking responsibility for engaging in unwanted sexual touching of R.F. while she was sleeping. Fields stated that "I'm not going to be coerced into using your terms if that's what you're looking for." The following exchange then occurred:

> R.F: What did I say I needed to hear from you. I was standing over here, yelling at you…I said I needed you to be accountable…responsibility for yourself…that you raped me…and I needed you to tell me that. That was you holding yourself to being able to say that to my face. That's what I

18

need and you can't even…there's no coercing.  That's what I need to hear to heal…you acknowledge what you did.

Fields: Then shut your phone off so we can have a real conversation.  Because I want to give you what you need.  What I don't want is to be surveilled.
…

Fields: You treat me like a piece of…evidence.

[R.F.]: You treat me like a piece of ass, that you can just have whenever you want.  How many times have you raped me.  I think it's three times.

Fields: …I'm not sitting here trying to defend myself.  I'm trying to fucking apologize to you.  And I want to do that.  But that's not acceptable.  Recording people is not acceptable…

When asked during the hearing if R.F. could recall the conversation, she said "[s]lightly" and that listening to the recording refreshed her memory.  She said her phone was white with a hot pink case.  She said the recording took place either in the garage area or the living room of their house.  R.F. was asked, "Is it your recollection that you ever did anything to hide that phone when the two of you were talking and you were recording it?"  R.F. answered

No because I had made blanket statements in our counseling sessions, that when I felt that our conversations were getting too out of control, or where I needed to protect myself, that – that I would just record when I needed to record.  And that was a blanket statement in couples counseling for – for all to hear.

R.F. conceded that she did not announce that she was recording Fields at the beginning of the recording.  At trial, R.F. testified that she has her "phone with [her] most of the time."

"Washington State's Privacy Act is considered one of the most restrictive in the nation."  State v. Kipp, 179 Wn.2d 718, 724, 317 P.3d 1029 (2014).  The act is generally implicated when one party records a conversation without the other party's consent.  Id.

19

at 724.  The privacy act makes it unlawful for "any individual . . . to intercept, or record any: private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation."  RCW 9.73.030(1)(b).  Evidence obtained in violation of the act is inadmissible for any purpose in any civil or criminal case.  RCW 9.73.050.  Additionally, any person found to have violated the act may be liable for civil damages or criminal penalties.  RCW 9.73.060, .080.  The statute does allow for "consent shall be considered obtained whenever one party has announced to all other parties engaged in the communication or conversation, in any reasonably effective manner, that such communication or conversation is about to be recorded or transmitted: PROVIDED, [t]hat if the conversation is to be recorded that said announcement shall also be recorded."  RCW 9.73.030(3).

The privacy act protects only "private" communications and conversation.  RCW 9.73.030.  Although not defined by the statute, the Washington Supreme Court has held that "private" as used in the act means "belonging to one's self," "intended only for the persons involved," and "a private communication . . . not open or in public."  State v. Clark, 129 Wn.2d 211, 225, 916 P.2d 384 (1996) (quoting Kandoranian v. Bellingham Police Dep't, 119 Wn.2d 178, 190, 829 P.2d 1061 (1992)).  "A communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable."  Kipp, 179 Wn.2d at 729 (citing State v. Townsend, 147 Wn.2d 666, 673-74, 57 P.3d 255 (2002)).

Factors bearing on the reasonableness of the privacy expectation include the duration, subject matter, and location of the communication as well as the presence or

20

potential presence of third parties, and the role of the nonconsenting party and his or her relationship to the consenting party.  Id.  The reasonable expectation standard calls for a case-by-case determination.  Id. (citing State v. Faford, 128 Wn.2d 476, 484, 910 P.2d 447 (1996)).  Ultimately, the intent or reasonable expectations of the participants as manifested by the facts and circumstances of each case controls as to whether the conversation is private.  Id. (Clark, 129 Wn.2d at 224-27).  "[T]he presence or absence of any single factor is not conclusive for the analysis."  Clark, 129 Wn.2d at 227.  Where the facts are undisputed, whether a conversation is "private" pursuant to the act is a matter of law reviewed de novo.  Kipp, 179 Wn.2d at 728.  The party seeking to admit evidence bears the burden of establishing its admissibility.  In this case, the facts are undisputed so de novo review applies.  As the party seeking to admit the recording, the State bears the burden of proving either that the privacy act does not apply or the recording is subject to an exception under the act.

To determine whether the privacy act applies, we must first evaluate whether the conversation was "private" under the meaning of the statute.  To do so, we evaluate the recording under the test outlined in Kipp.

Under that test, we first examine the subjective intention of the parties.  In the recording, Fields manifests his intent not to be recorded by clearly stating multiple times that he did not consent to being recorded.  Washington courts have found subjective intent that a conversation be private even where a party does not explicitly state as much.  Kipp, 179 Wn.2d at 729 (citing State v. Christensen, 153 Wn.2d 186, 193, 102 P.3d 289 (2004)).  Fields demonstrated his subjective intention that the conversation remain private by explicitly stating he did not wish to be recorded and that R.F. did not

21

have permission to record him. Despite R.F. recording the conversation and wanting to share it with others later, the State did not show that R.F. had any subjective intent that the conversation she was engaging in with her husband was a public conversation. The recording itself established that R.F. reassured her husband that she was not interested in blackmailing him and that she just needed to "hear" him say he raped her so that she could "heal."

Next, we must examine whether Fields' expectation of privacy in the conversation with R.F. was reasonable by applying the factors outlined in Kipp. Here, the duration and subject matter of the recorded conversation indicate that it was intended to be private. The recording introduced at trial was nearly nine minutes long and appears to be a portion of a longer conversation. Washington courts have previously indicated that "fairly lengthy" conversations such as this indicate the nonrecorded party can reasonably expect it to be private. State v. Babcock, 168 Wn. App. 598, 606, 279 P.3d 890 (2012) (holding that recorded conversations lasting between 10 and 30 minutes were "fairly lengthy" and duration combined with subject matter created a reasonable expectation of privacy); Clark, 129 Wn.2d at 225 (concluding that abbreviated "two-minute" discussions with a stranger did not create a reasonable expectation of privacy); Kipp, 179 Wn.2d at 730 (the parties agreed that the 10 minute duration of the conversation suggested it was private).

The subject matter of the conversation similarly supports a reasonable expectation of privacy. "An incriminating statement of a serious subject matter is the type of conversation protected under the act." Kipp, 179 Wn.2d at 730. Here, Fields and R.F. discussed Fields' sexual abuse of R.F., during which Fields apologized and

said he was "not saying that it didn't happen." The recording also includes discussions about marriage counseling, divorce, and psychological treatment. The incriminating statements made by Fields, coupled with other serious subjects not "normally intended to be public" show that Fields had a reasonable expectation of privacy in the conversation. Id. at 731.

The location of the conversation and absence of third parties also demonstrates that Fields had a reasonable expectation of privacy in the conversation. At a preliminary hearing, R.F. testified that the conversation took place inside their home, likely in the living room or garage. "A private home is normally afforded maximum privacy protection." Id. (citing State v. Hastings, 119 Wn.2d 229, 233, 830 P.2d 658 (1992)). It is undisputed that no third party was present during the conversation. These factors weigh in favor of Fields' reasonable expectation of privacy. Finally, the two parties in the recorded conversation in this case were at that point a married couple. Communications between spouses are typically subject to more protection and privacy than conversations with others, such as strangers or public officials. See State v. Burden, 120 Wn.2d 371, 375, 841 P.2d 758 (1992); RCW 5.60.060(1).

The States urges this court to hold that because it can be inferred from the recording that Fields knew he was being recorded, we should find that he had no reasonable expectation of privacy. The State relies on State v. Mohamed, 195 Wn. App. 161, 380 P.3d 603 (2016) and State v. Modica, 164 Wn.2d 83, 186 P.3d 1062 (2008) to support its assertion. These cases are inapposite as the circumstances in each are vastly different than those at issue in the instant case. In Modica, the Supreme Court held that where a defendant was in jail, he had no reasonable

23

expectation of privacy in calls made from the jail and recorded by the jail. 164 Wn.2d at 89. In Mohamed, this court held that a co-defendant had no reasonable expectation of privacy in phone calls made to him from a jailed co-defendant. 195 Wn. App. at 166. In both Mohamed and Modica, the jails conveyed to the defendants that their making and receiving calls from the jail would be recorded. Mohamed, 195 Wn. App. at 164 (citing Modica, 164 Wn.2d at 86). The Supreme Court cautioned in Modica, "we have not held, and do not hold today, that a conversation is not private simply because the participants know it will or might be recorded or intercepted." 164 Wn.2d at 88.

We conclude that under the factors outlined in Kipp, Fields had a reasonable expectation of privacy in the conversation with R.F. We hold that the conversation was private. Because the conversation was private, we next determine whether the announcement or consent exceptions to the prohibition under the Privacy Act apply.

The statute allows consent of the non-recording party to be inferred where one party has announced to all other parties in a reasonably effective manner that the conversation is being recorded as long as that announcement is included in the recording. RCW 9.73.030(3).

There was no such announcement in the recording at issue here. The recording reflects that the parties were in the middle of a conversation when R.F. began to record it. The recording contains no statement or other "reasonably effective" communication by R.F. that she is recording the conversation. Instead, the State argues that Fields knew she was recording because R.F. had her phone in her hand during the conversation and had previously told Fields she would record conversations she felt were getting "out of control." However, notifying a party at an earlier point in time that

24

you may record a later conversation based on your feelings about that conversation does not meet the requirements of the exception outlined by statute. In contrast, a second recorded conversation introduced at trial and unchallenged by the defense begins with R.F. explicitly stating "because you are insulting me and I'm gonna record it till you leave the house." The first recording at issue does not include any announcement or other communication from R.F. informing Fields that she was recording their conversation. We thus find that the recording does not fall under the statutory exception.

In the instant case, R.F. conceded that she did not announce to Fields that she was actually recording the conversation. Nor did R.F. testify as to how she conveyed to Fields that she was actually recording him during the recording. Yet, the State argues that the recording itself suggests that Fields knew he was being recorded because he made reference to concerns of black mailing and asked R.F. to shut off her phone. Not surprisingly, the State does not attempt to argue that Fields' knowledge that he was being recorded satisfies the strict statutory requirement that R.F. announce that she was recording in the recording. Instead, the State argues, without any supporting authority, that because it can be inferred from the recording that Fields knew he was being recorded, that fact transformed what would have been a private conversation to a public conversation and, thus, the privacy act does not apply.

This argument turns the privacy act on its head and defeats the purpose of the statutory announcement requirement. Requiring the party recording to announce to all parties on the recording that they were being recorded leaves the question as to whether subjects of the recording knew they were being recorded undebatable. By not

25

complying with that requirement, under the State's argument, it now opens up for debate as to whether the conversation itself is even subject to the privacy act depending on whether subjects knew they were being recorded, even when they expressly state they do not consent to being recorded.

Moreover, despite the State's contention and defense counsel's agreement during oral argument,[3] that it can be inferred from the recordings that Fields knew he was being recorded, it can just as well be inferred from the recordings that Fields knew R.F. had her phone on and *could* record him as opposed to knowing that she actually had already started recording him. In the evidentiary hearing, despite the fact that the State called R.F. as a witness, the State did not ask her what she did with her phone to convey to Fields that she was actually recording him. She was not asked how she held her phone, if the display on her phone indicated it was recording, and if she showed Fields that it was recording. Yet, it is the State's burden to prove the admissibility of the evidence.

We conclude that the recorded conversation was private and did not fall under any exception to the privacy act. Accordingly, it was improperly admitted. The admission of evidence in violation of the privacy act is generally subject to a harmless error analysis. Kipp, 179 Wn.2d at 733 n.8; Christensen, 153 Wn.2d at 200 (declining to conduct a harmless error analysis because the State did not argue it). The State here does not present any harmless error argument so we decline to address it. We reverse

---

[3] Wash. Court of Appeals oral argument, State v. Fields, No. 84811-9-I (June 6, 2024), at 11 min., 22 sec. through 16 min., 40 sec., and 20 min. (State's argument), 10 sec., through 21 min., 35 sec. (Defense argument), *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2024061210.

and remand for a new trial without the challenged audio recording taken in violation of the privacy act.

## Opinion Testimony

Fields argues that the investigating detective was permitted to give improper opinion testimony regarding R.F.'s demeanor during her police interview, namely that she was "crying" and was not "gleeful" or "giggling."

Witnesses may not express an opinion, directly or indirectly, on credibility or guilt. State v. Kirkman, 159 Wn.2d 918, 927-28, 155 P.3d 125 (2007). Whether testimony is impermissible opinion testimony depends on several factors, including "'(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" State v. Aguirre, 168 Wn.2d 350, 359, 229 P.3d 669 (2010) (quoting Kirkman, 159 Wn.2d at 928). Improper opinion testimony from a police officer raises additional concerns because "an officer's testimony often carries a special aura of reliability." Kirkman, 159 Wn.2d at 928. However, testimony based on inferences from the evidence, which does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury, does not generally constitute an opinion on guilt. State v. Rafay, 168 Wn. App. 734, 806, 285 P.3d 83 (2012). Admission of testimony is reviewed for abuse of discretion. Aguirre, 168 Wn.2d at 359.

In the instant case, the detective testified that during the interview R.F. "cried" and was "fearful." The State asked whether R.F. had giggled, laughed, or discussed "being excited, or thrilled, or gleeful" during that time, to which the detective answered that R.F. had not. The trial court overruled Fields' objection to the testimony. This

27

witness and testimony followed the defense's cross-examination of R.F., in which the defense asked whether R.F. had been "gleeful," "excited," or "happy" to be able to report Fields to police.

In Aguirre, the Washington Supreme Court held it was not improper opinion testimony where a police officer testified to a "general description of the demeanor of domestic violence victims" before providing testimony limited to "her objective observations of the victim during their interview as compared to other victims whom [the officer] had interviewed during her lengthy criminal justice career."  168 Wn.2d at 360. Here, the detective's testimony was limited only to his observations of R.F., he did not compare or discuss the demeanor of anyone else or the expected demeanor of a person reporting sexual assault.  Additionally, the questions eliciting such statements were in direct response to the defense theory that R.F. had fabricated allegations against Fields and was happy to report him to police because she was unhappy in their marriage.

The trial court did not abuse its discretion in declining to find that the detective's observations of R.F.'s demeanor amounted to improper opinion testimony.[4]

## CONCLUSION

The trial court erred in admitting the recording of the conversation between Fields and R.F. in violation of the Washington privacy act.  We also hold that under RCW

---

[4] Fields also challenged the introduction of testimony from the detective that R.F. arrived to the Auburn police station to "report a sexual assault."  Although this testimony was excluded when the court granted Fields' motion in limine, Fields failed to object to the testimony at trial. Because he failed to object, the issue is not properly preserved for appeal.  See State v. Sullivan, 69 Wn. App. 167, 170-72, 847 P.2d 953 (1993) (holding that when a party successfully moves in limine to exclude evidence, it is still required to object to the introduction of that evidence at trial in order to allow the trial court an opportunity to cure any potential prejudice and preserve the matter for appeal).  We decline to review the issue.

5.60.060(9), the presence of both spouses in a marriage does not vitiate the privilege between either spouse and a licensed marriage and family therapist in a joint counseling session in which the therapist is providing treatment to both spouses jointly. Defense counsel was ineffective for conceding that the privileged testimony of Stenger, the marriage and family therapist, was admissible. The error prejudiced Fields. We reverse and remand for a new trial.

Coburn, J.

WE CONCUR:

Díaz, J.

Dwyer, J.