IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of<br><br>KEITH WHITEHAWK, FKA KEITH PUETT,<br><br>Petitioner. | No. 84616-7-I<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — In 2012, Keith Whitehawk FKA Keith Puett[1] pleaded guilty to first degree robbery and received a sentence of life without the possibility of parole (LWOP) under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570. In this personal restraint petition (PRP), Whitehawk argues he received ineffective assistance of counsel when he pleaded guilty to his "first strike," a 2002 second degree assault with a deadly weapon conviction. He also argues he received ineffective assistance of counsel in 2012 because his attorney did not challenge the 2002 conviction. We deny his PRP.

FACTS

In 2002, the State charged 18-year-old Whitehawk with one count of second degree assault with a deadly weapon under RCW 9A.36.021(1)(c). The court appointed attorney Michael Brodsky to represent him.

The information alleged that Whitehawk assaulted Daniel Smith and Joshua Turner "with a deadly weapon, to-wit: a pellet gun." The probable cause

---

[1] On January 22, 2025, this court granted petitioner's motion to change the case caption and title to reflect he changed his name from Keith Puett to Keith Whitehawk.

affidavit provides that on February 26, 2002, Whitehawk assaulted Smith outside a Denny's restaurant in Everett when he "pulled out a gun, cocked the trigger[,] and pointed it at [Smith]." Smith described the gun as a ".45 [caliber], which was chrome in color." Then, the next day, February 27, Whitehawk assaulted Turner outside the former Topper Motel in Everett. Turner said that Whitehawk approached him and "pulled a silver gun out of his pants and racked the slide." After Turner told Whitehawk he had no money, Whitehawk put the gun to Turner's temple and said, " 'I knew it. If you did, I would have shot you.' " When police arrested Whitehawk, he told them that he had "dumped" the gun and that "he thought it was a [BB]/pellet gun."

Ultimately, Whitehawk pleaded guilty as charged. In a "Statement of Defendant on Plea of Guilty," Whitehawk wrote that "[o]n or about Feb. 27, 2002 in Snohomish County, Washington, I intentionally assaulted Daniel Smith and Joshua Turner with a pellet gun." And he acknowledged that second degree assault with a deadly weapon is a "most serious offense" under former RCW 9.94A.030(25) (2002), that two or more convictions for most serious offenses would make him a "persistent offender" under former RCW 9.94A.030(29), and that if he was convicted as a persistent offender, "the court must sentence" him to LWOP under the "Three Strikes Law."

The State agreed not to file additional charges and recommended a sentence of 6 months, the low end of the standard range. At his 2002 plea hearing, the trial court determined Whitehawk was entering his plea knowingly, intelligently, and voluntarily and accepted his guilty plea to second degree

2

assault. The court sentenced Whitehawk to 6 months' confinement and 12 months of community custody.

In 2005, Whitehawk was convicted of his second most serious offense, another second degree assault. Then, in 2012, the State charged Whitehawk with his third most serious offense, first degree robbery. The court appointed attorney Max Harrison to represent him.

Whitehawk again pleaded guilty as charged. In the Statement of Defendant on Plea of Guilty, Whitehawk acknowledged that the first degree robbery conviction would be his third "strike" under the POAA and that the conviction carried a "mandatory" LWOP sentence. At Whitehawk's 2012 plea hearing, Harrison and Whitehawk explained that Harrison planned to take the case to trial, but Whitehawk decided he wanted to plead guilty to avoid a potential no-contact order with a witness in an unrelated pending case. In exchange for Whitehawk's plea to first degree robbery, the State agreed not to file charges in the other case. The court determined Whitehawk was entering his guilty plea knowingly, intelligently, and voluntarily and accepted his guilty plea.

At sentencing, Whitehawk discussed his two previous strike offenses. As for his 2002 conviction, he told the court:

> [T]here's no way I should have ever got a strike for it, but I was new to the adult system. My attorney gave me some bad advice, and I took a plea bargain not expecting anything to come of it. Shot one of my friends with a BB gun and got an Assault II for it. So that was my first strike.

On December 13, 2012, the court sentenced Whitehawk to LWOP.

3

In August 2022, Whitehawk moved under CrR 7.8(b)(4) and (5) to set aside his 2012 guilty plea, vacate his 2012 judgment and sentence, and go to trial. Whitehawk argued that the State breached the plea agreement by asking the court to impose community custody and that the court exceeded its authority by imposing 36 months of community custody. On September 27, 2022, the State moved to transfer Whitehawk's CrR 7.8(b) motion to this court as a PRP.

The same day, Whitehawk filed an amended CrR 7.8(b) motion. He added new grounds to vacate, including a collateral attack of his 2002 conviction. He asserted he was "actually innocent" of using a deadly weapon in that incident, so his 2002 conviction should "not constitute a strikeable offen[s]e." Whitehawk attached a declaration to his amended motion, attesting that the pellet gun he used during the 2002 assaults was unloaded. And he argued that Brodsky was ineffective for allowing him to plead guilty to the 2002 assault because the unloaded pellet gun did not qualify as a deadly weapon. In turn, Whitehawk argued Harrison was ineffective at the 2012 sentencing for failing to challenge the 2002 conviction as a strike offense. Whitehawk alleged that his claims were not time barred because he is actually innocent.[2]

The superior court transferred Whitehawk's amended CrR 7.8(b) motion to this court to be heard as a PRP. Our court issued an order partially dismissing Whitehawk's PRP, concluding that because he is serving LWOP, Whitehawk cannot show that the imposition of community custody prejudiced him, so he is

---

[2] Whitehawk also argued that the claim was not time barred because his 2012 judgment and sentence was invalid on its face.

4

not entitled to relief on those claims. But because his "gateway actual innocence claim [ ] raises a nonfrivolous issue," we will address the merits of that claim.

ANALYSIS

Whitehawk argues that he received ineffective assistance of counsel in deciding whether to enter his 2002 guilty plea and at his 2012 sentencing. We disagree.[3]

Relief by collateral attack is " 'extraordinary.' " *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 14, 409 P.3d 214 (2018) (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)). We limit collateral relief because "it undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders." *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992). Still, a petitioner may seek relief through a PRP when he is under unlawful restraint. RAP 16.4(a); *In re Pers. Restraint of Dyer*, 143 Wn.2d 384, 391, 20 P.3d 907 (2001). Restraint is unlawful when the conviction or the sentence violates the United States Constitution, our state constitution, or our laws. RAP 16.4(c)(2).

When a petitioner alleges constitutional error in a PRP, he must show by a preponderance of the evidence that the error caused actual and substantial prejudice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 814, 792 P.2d 506

---

[3] The State argues that Whitehawk's PRP is time barred. Whitehawk contends it is timely under the gateway innocence doctrine. Washington courts have not yet determined whether the gateway actual innocence doctrine applies to guilty pleas. Because we conclude Whitehawk cannot show that he received ineffective assistance of counsel, we address his claims on the merits and need not decide whether the gateway actual innocence doctrine applies here.

(1990); *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). "To show actual and substantial prejudice, a petitioner must show that the outcome likely would have differed had the alleged error not occurred." *In re Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 44, 543 P.3d 842 (2024).

An ineffective assistance of counsel claim presents mixed questions of law and fact that we review de novo. *State v. K.A.B.*, 14 Wn. App. 2d 677, 707, 475 P.3d 216 (2020) (citing *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018)). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Washington courts apply the two-prong *Strickland* test to determine whether a defendant has a valid ineffective assistance of counsel claim. *State v. Jefferies*, 105 Wn.2d 398, 417-18, 717 P.2d 722 (1986). Under *Strickland*, a petitioner must show both (1) that defense counsel's performance was deficient and (2) that the deficient performance resulted in prejudice. 466 U.S. at 687.

A petitioner proves deficient representation by showing that defense counsel's performance fell " 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). The petitioner must overcome the strong presumption that trial counsel's representation was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To rebut this presumption, a

petitioner must show that "there is no conceivable legitimate tactic explaining counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). If we can characterize trial counsel's conduct as legitimate trial strategy or tactics, it is not constitutionally deficient representation. *Kyllo*, 166 Wn.2d at 863. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

To show prejudice, a defendant must show there is a reasonable probability that except for counsel's unprofessional errors, the results of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335, 899 P.2d 1251 (1995). A defendant who shows prejudice under this standard also satisfies the burden for relief under a PRP. *Skone*, 30 Wn. App. 2d at 44.

Effective assistance of counsel includes assisting a defendant in making an informed decision about whether to plead guilty or proceed to trial. *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010). To show deficient performance, the defendant must show that his counsel failed to "actually and substantially" assist him in deciding whether to plead guilty. *State v. Cameron*, 30 Wn. App. 229, 232, 633 P.2d 901 (1981). And that but for counsel's failure to adequately advise him, there is a reasonable probability he would have pleaded not guilty and insisted on going to trial. *In re Pers. Restraint of Riley*, 122 Wn.2d 772, 780-81, 863 P.2d 554 (1993). A bare allegation that a petitioner would have

7

not pleaded guilty if he had known all the consequences of the plea is not enough to establish prejudice under *Strickland*. *Id.* at 782.

When assisting a client in deciding whether to plead guilty, counsel must, at the very least, reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision. *A.N.J.*, 168 Wn.2d at 111-12. To provide constitutionally adequate assistance, " 'counsel must, at a minimum, *conduct a reasonable investigation* enabling [counsel] to make informed decisions about how best to represent [the] client.' " *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 866, 16 P.3d 610 (2001)[4] (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)). A reasonable investigation includes a duty to research relevant law. *Kyllo*, 166 Wn.2d at 862. But an attorney need be familiar with the law only in effect at the time of representation, and a failure to anticipate a change in the law does not constitute ineffective assistance of counsel. *See State v. Fields*, 31 Wn. App. 2d 687, 705, 553 P.3d 71 (2024) ("where no case law indicates an error, conduct by defense counsel that is later found to be contrary is not deficient performance"); *Davis*, 152 Wn.2d at 674 (we evaluate the reasonableness of counsel's performance from counsel's perspective at the time of the alleged error).

Counsel must also investigate all reasonable defenses. *Davis*, 152 Wn.2d at 744. But he does not have a duty to pursue strategies that reasonably appear

---

[4] Alterations in original.

unlikely to succeed. *State v. Brown*, 159 Wn. App. 336, 371, 245 P.3d 776 (2011); *see McFarland*, 127 Wn.2d at 334 n.2 (if officers had probable cause to arrest the defendant, his arrest was not illegal, so there was no reason his trial counsel should have raised a motion to suppress based on a warrantless arrest).

"A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree[,] . . . [a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c).[5] The statute defines "deadly weapon" as

> any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

RCW 9A.04.110(6).[6] When Whitehawk pleaded guilty in 2002, two cases addressed whether a pellet gun could be a deadly weapon under RCW 9A.04.110(6). Those cases are *State v. Carlson*, 65 Wn. App. 153, 828 P.2d 30 (1992), and *State v. Taylor*, 97 Wn. App. 123, 982 P.2d 687 (1999).

In *Carlson*, the defendant assaulted a person with what the defendant claimed was an "inoperative, unloaded, sawed off B-B gun." 65 Wn. App at 155. The court convicted the defendant of second degree assault with a deadly weapon following a bench trial. *Id.* The defendant appealed the conviction, arguing the court erred because it did not specifically find that the BB gun was a

---

[5] This is the same language the statute used in 2002. *See* former RCW 9A.36.021(1)(c) (2001).

[6] This definition has not changed since Whitehawk's 2002 plea. *See* former RCW 9A.04.110(6) (1988).

deadly weapon. *Id.* at 157. We agreed and reversed the second degree assault conviction. *Id.* at 165. We explained that whether a weapon or thing is "readily capable of causing substantial bodily harm" under RCW 9A.04.110(6) is a question of fact, and that the trial court did not issue sufficient findings to support its conclusion. *Id.* at 159-60, 161. As a result, we determined there was not substantial evidence in the record that the weapon was "in fact 'readily capable' " of causing substantial bodily harm. *Id.* at 161. In doing so, we recognized that even "an *unloaded* B-B gun, if used in such a circumstance that it could be readily loaded by the assailant, could be 'readily capable.' " *Id.*

In *Taylor*, the defendant pointed "a black BB pistol that resembled a .45-caliber Colt automatic pistol" at three boys. 97 Wn. App. at 125. He pointed the pistol about one-half inch from one boy's head. *Id.* After a bench trial, the court found the defendant guilty of second degree assault with a deadly weapon. *Id.* The defendant appealed his conviction. *Id.* Citing *Carlson*, he argued there was insufficient evidence that the BB gun he used during the assault was a deadly weapon because the State presented no evidence that the gun "was loaded or readily capable of being loaded." *Id.* at 127-28.

Division Three of our court distinguished *Carlson* and pointed out that RCW 9A.04.110(6) requires the court to consider the circumstances in which the weapon is "threatened to be used" as well as whether the weapon could have produced substantial bodily harm. *Taylor*, 97 Wn. App. At 127-28. Division Three affirmed the conviction because it found ample evidence that the defendant "threatened to use the BB gun to shoot the three boys in a way that

would have caused bodily harm." *Id.* at 128-29. And that the threats created an inference that the BB gun was loaded. *Id.* at 128.

Here, nothing in the probable cause affidavit suggests that the pellet gun Whitehawk used to assault his victims was inoperable or unloaded. And the evidence supports that Whitehawk, like the defendant in *Taylor*, used the pellet gun to threaten his victims, creating a presumption that the gun was loaded.

In the affidavit of probable cause, a detective describes his conversation with Whitehawk about the assault of Smith:

> [Whitehawk] said that a "guy" had been giving his girlfriend a bad time. They were at Denny's on Pacific when he approached the guy and asked him to come look at something. He said he took out a gun and pointed it at the guy's head and said a couple of things to him.

And Turner said Whitehawk "pulled a silver gun out of his pants[,] racked the slide," and "started walking behind him." Whitehawk then asked Turner if he had any money and told Turner that he " 'would have shot [him]' " if he did.

In his PRP, Whitehawk now argues that his pellet gun was, in fact, unloaded. In a September 21, 2022 declaration attached to his amended CrR 7.8(b) motion to vacate, Whitehawk declares that the pellet gun he used in the incident that occurred in the Denny's parking lot involving Smith "didn't have any pellets or any other kind of ammunition in it, and [in fact] did not even have a [carbon dioxide] cartridge in it."[7]

---

[7] He later clarified that his statement in his September 21, 2022 declaration that "the pellet gun did not have any pellets or any kind of ammunition in it . . . is true as to both of the incidents concerning . . . Smith and . . . Turner."

In its response to Whitehawk's PRP, the State points out that even if the pellet gun was unloaded, it would still amount to a deadly weapon if it was readily capable of being loaded. And it notes that Whitehawk told the court at his 2012 sentencing for first degree robbery that he actually fired the pellet gun during one of the 2002 incidents.[8]

Whitehawk then issued another declaration stating that he "did not have any pellets, ammunition, or means of firing the pellet gun that was the basis of the 2002 second-degree assault charge," and that "[t]his is true as to both of the incidents concerning . . . Smith and . . . Turner." He also declared that "I incorrectly recalled and misstated that the 2002 second-degree assault case was based on me shooting one of my friends with a BB gun."

Even assuming that Whitehawk's declarations are credible, they do not show that Brodsky's representation was deficient. No evidence available at the time of the plea suggested that Whitehawk's pellet gun was unloaded, and Whitehawk does not claim that he told Brodsky any of the information he now asserts in his declarations. Nor does he allege that Brodsky failed to adequately investigate whether the gun was loaded. And Brodsky explains in a declaration that although he lacks specific memory of the case, it is "reasonably likely" that he relied on *Taylor* to conclude that even if Whitehawk's pellet gun was not loaded, the facts would support that he used the gun as a deadly weapon. It was not unreasonable for Brodsky to rely on *Taylor* to reach such a conclusion.

---

[8] Whitehawk told the court that he "[s]hot one of my friends with a BB gun and got an Assault II for it."

Still, Whitehawk suggests that *State v. Swofford*, No. 38131-5-III (Wash. Ct. App. Nov. 17, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/381315_unp.pdf, compels a different result. In that case, the defendant stood outside a car and pointed what looked like a handgun at the car's occupants. *Id.* at 2. Police later learned the gun was a pellet gun. *Id.* at 3. A jury convicted the defendant of second degree assault with a deadly weapon. *Id.* at 4, 6. He appealed, arguing sufficient evidence did not support the conviction. *Id.* at 7. Division Three agreed in part. *Id.* It noted that the car windows were "rolled up throughout the encounter," and it reasoned that the State "submitted no evidence of what a BB, even fired at close range, could do to a car windshield or window." *Id.* at 12. So, the State's evidence "required the jury to speculate" that the gun could have caused death or bodily harm to the car's occupants. *Id.*[9]

Whitehawk fails to show how *Swofford* conflicts with the holdings in *Carlson* and *Taylor*. Even so, Division Three decided *Swofford* in 2022, 20 years after Whitehawk entered his plea. And Brodsky cannot be deficient for failing to predict the holding of a case that Division Three decided two decades later. *See Fields*, 31 Wn. App. 2d at 705; *Davis*, 152 Wn.2d at 674.

---

[9] Division Three disagreed insufficient evidence supported one count of second degree assault where the defendant pointed the BB gun at a victim standing outside the car two to five feet from the defendant. *Swofford*, No. 38131-5-III, slip op. at 12, 3.

Because Whitehawk does not show that Brodsky failed to assist him actually and substantially in deciding whether to plead guilty to the 2002 assault charge, we deny his PRP.[10]

Brunner, J

WE CONCUR:

Díaz, J.                    Mann, J.

---

[10] Whitehawk also alleges that Harrison was ineffective for failing to challenge the constitutionality of his 2002 plea during the 2012 sentencing for his third strike offense. Because we conclude that case law supports that Whitehawk's BB gun qualified as a deadly weapon, we deny that claim as well.